**Vicki MARSINGILL and Paul Marsingill, wife and husband, Appellants,**

v.

**James O'MALLEY, M.D., Appellee.**

No. S–9859.

Supreme Court of Alaska.

Nov. 22, 2002.

Rehearing Denied Dec. 11, 2002.

Robert H. Wagstaff, Law Offices of Robert H. Wagstaff, Anchorage, for Appellant.

Donna M. Meyers and Howard A. Lazar, Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc., Anchorage, for Appellee.

Before: FABE, Chief Justice, MATTHEWS, BRYNER, and CARPENETI, JUSTICES.

*OPINION*

BRYNER, Justice.

## I. INTRODUCTION

One night several months after having stomach surgery, Vicki Marsingill called her surgeon, Dr. James O'Malley, complaining of abdominal pain and nausea. Dr. O'Malley advised Marsingill to go to the emergency room and offered to meet her there, but Marsingill said she felt better and declined to go. Several hours later, Marsingill lost consciousness from an intestinal blockage and suffered permanent injuries. Marsingill sued Dr. O'Malley, claiming that he lacked the skill and knowledge to advise her properly and that the information he gave her over the telephone did not allow her to make an intelligent treatment decision. A jury rejected these claims. The main issues on appeal are whether the trial court erred in excluding evidence of Dr. O'Malley's failure to pass tests for board certification as a surgeon and whether the jury instructions correctly described the standard for deciding whether Dr. O'Malley gave Marsingill adequate information. We find no abuse of discretion in the court's rulings excluding evidence but hold that the jury should have been instructed to use the reasonable patient standard to decide if Dr. O'Malley gave Marsingill sufficient information about her condition and treatment choices.

## II. FACTS AND PROCEEDINGS

In October 1994 Dr. O'Malley performed surgery to remove staples that another surgeon had previously placed in Vicki Marsingill's stomach to facilitate weight loss. By January 1995 Marsingill had recovered from the surgery and was cleared to return to work.

While dining out with a friend on the evening of February 14, 1995, Marsingill "suffered a sudden onset of illness, was in pain, felt nauseous, and was unable to eat, so [went] home." Her pain worsened over the next few hours, and she eventually asked her daughter to call Dr. O'Malley. Her daughter told Dr. O'Malley that Marsingill looked bad, that she was nauseous and in pain, that she was unable to burp or have a bowel movement, and that her stomach was "as hard as a rock." Dr. O'Malley then spoke directly with Marsingill, who sounded anxious and upset. She informed him that she was having abdominal pain, felt bloated, and could not burp. Dr. O'Malley advised Marsingill that he could not evaluate her over the phone but that "if she felt bad enough to call him at night" she should go the emergency room. He repeated this advice several times but did not venture any opinion about the cause of Marsingill's symptoms or tell her that her condition was potentially life-threatening or serious. He left it up to her whether to seek emergency room treatment.

When Marsingill asked what would happen at the emergency room, Dr. O'Malley informed her that the doctors there would probably take x-rays and insert a nasogastric tube to relieve the pressure in her stomach.[1] Dr. O'Malley knew that Marsingill had previously had nasogastric tubes inserted and, like

---

1. Inserting a nasogastric tube involves placing a tube through the patient's nose, down the back of the throat into the esophagus, and into the stomach.

most patients, strongly disliked them. Soon after hearing that she would likely need to have a nasogastric tube inserted if she went to the emergency room, Marsingill ended the call, telling Dr. O'Malley that she thought that she could burp and was feeling better.

After hanging up, Marsingill told her daughter that she was feeling better and would try to "tough it out for awhile." But later that night Marsingill's husband found her unconscious on the bathroom floor. Paramedics rushed her to the hospital, where an emergency operation later revealed that she had experienced an intestinal blockage. But by then the obstruction had caused Marsingill to go into shock; as a result, she suffered brain damage and partial paralysis.

Marsingill eventually filed suit against Dr. O'Malley, asserting four claims, only two of which currently remain relevant: (1) that the doctor lacked skill and knowledge in general surgery and, as a result, committed malpractice by giving Marsingill incompetent advice when she called about her symptoms and (2) that the doctor had breached his duty to give Marsingill enough information to enable her to make an informed choice about going to the emergency room for treatment.

To meet her burden of proving that Dr. O'Malley lacked knowledge and skills as a surgeon, Marsingill planned to introduce evidence that he had repeatedly failed tests for AMA board certification in general surgery. Marsingill maintained that this evidence was relevant to prove that Dr. O'Malley lacked the requisite degree of skill and knowledge and that it also would be admissible to impeach defense testimony and to establish the basis for her own experts' opinions.

But in a pretrial motion, Dr. O'Malley asked the trial court to exclude all evidence regarding his medical education and training except evidence that he had "graduated from medical school, completed a medical degree, and was not Board Certified." In support of his pretrial motion, Dr. O'Malley argued that evidence of his failed attempts at board certification was inadmissible character evidence and could not be properly used to show either a general lack of skill or an act of negligence on any particular occasion.

The trial judge granted Dr. O'Malley's motion to exclude the evidence and instructed both parties not to introduce evidence of "the details pertaining to Dr. O'Malley's medical education background." On several occasions during trial Marsingill moved to introduce evidence regarding Dr. O'Malley's lack of board certification, arguing that the doctor or his expert witnesses had opened the door to a broader inquiry into his background. The court denied each of these motions.

The expert testimony at trial focused on the symptoms of post-surgical bowel obstructions and the appropriate course of action for a physician to take in response to a patient's call complaining of these symptoms. Six medical experts testified—three for Marsingill and three for Dr. O'Malley—about the appropriateness of Dr. O'Malley's advice during the February 14 telephone call from Marsingill. Their opinions were sharply divided.

Marsingill's experts—Drs. Battle, Modlin, and Ravden—uniformly agreed that Dr. O'Malley's actions fell below the accepted standard of care. They particularly criticized Dr. O'Malley's failure to communicate to Marsingill the true seriousness of her situation, the extent of the risk she faced, and the importance of getting immediate help. Additionally, they questioned Dr. O'Malley's professional judgment in needlessly telling Marsingill that she would likely be treated with a nasogastric tube if she decided to go to the emergency room. Because installing such tubes involves a painful procedure, they emphasized, a competent physician who wanted to encourage a patient to seek emergency room treatment would not have offered up the prospect of being treated with a nasogastric tube.

In contrast, however, Dr. O'Malley's experts—Drs. Gardiner, Macho, and Moossa—uniformly disagreed with this assessment, insisting that on the whole Dr. O'Malley had provided "very good care." Dr. Gardiner, for example, described a physician's duty during a phone call as being very limited, concluding that Dr. O'Malley had done everything necessary to fulfil that duty. Dr. O'Malley's experts also were adamant in expressing their view that the doctor had acted properly in simply advis-

ing Marsingill to go to the emergency room, without engaging her in a speculative discussion of the possible causes of her symptoms. While acknowledging that Marsingill's prior abdominal surgeries placed her at heightened risk for an intestinal obstruction and that the symptoms she described on the telephone were consistent with such an obstruction, they emphasized that a physician cannot accurately diagnose a patient over the telephone and concluded that the doctor therefore had no "obligation to speculate." Dr. O'Malley's experts also took exception to the claim that it was improper for him to mention the likelihood of Marsingill's being treated with a nasogastric tube at the emergency room. To the contrary, they claimed, Dr. O'Malley acted appropriately by giving Marsingill an honest and accurate answer to her question about what she could expect if she went to the emergency room.

In the course of their testimony, the expert witnesses also gave divergent opinions about the scope of a physician's ethical duty to give patients sufficient information to make intelligent treatment decisions. Section 8.08 of the AMA Code of Medical Ethics addresses this duty of disclosure, providing: "The patient's right of self-decision can be effectively exercised only if the patient possesses enough information to enable an intelligent choice." Marsingill's experts maintained that Dr. O'Malley had violated Section 8.08 by failing to give her enough information to make an intelligent choice about whether to seek emergency room treatment. As already mentioned, Dr. O'Malley's experts took the opposite view, maintaining that the doctor had satisfied his duty simply by advising Marsingill that she should go to the emergency room for an examination.

Dr. O'Malley himself shifted positions: when initially questioned about his obligations under Section 8.08, he testified that the provision "applies to Mrs. Marsingill. It

doesn't really apply to me." But he later reconsidered, acknowledging that Section 8.08 applied to his conduct—that he did "have [an] obligation to give [Marsingill] enough information so that she could make an intelligent choice as to whether she should go to the emergency room."

At the conclusion of trial, Marsingill proposed jury instructions covering her alternative theories of liability—that Dr. O'Malley committed malpractice by lacking adequate skill and knowledge to enable him to respond appropriately to her telephone call and that he breached his duty to give her enough information to enable her to make an informed decision about going to the emergency room for examination and treatment.

With respect to the second of these theories—Dr. O'Malley's alleged breach of Section 8.08's duty to inform—Marsingill's proposed instruction would have required the jury to decide the sufficiency of Dr. O'Malley's communications from the standpoint of a reasonable patient in Marsingill's position. But the trial court rejected the proposed "reasonable patient" instruction, instead directing the jury to measure Dr. O'Malley's compliance by relying exclusively on the expert testimony addressing his compliance with a general surgeon's professional standard of care.

After the jury returned a verdict in favor of Dr. O'Malley, Marsingill filed this appeal.

## III. DISCUSSION

### A. Evidentiary Claims

▮▮▮ Marsingill based her malpractice claim partly on the theory that Dr. O'Malley lacked the requisite skills and ability to recognize the likely cause of her symptoms and extent of the risk that she consequently faced; he thus negligently failed to communicate the urgency of her receiving immediate medical attention.[2] On appeal, Marsingill as-

---

**2.** AS 09.55.540(a) defines the elements of a medical malpractice claim in Alaska:

(a) In a malpractice action based on the negligence or wilful misconduct of a health care provider, the plaintiff has the burden of proving by a preponderance of the evidence

(1) the degree of knowledge or skill possessed or the degree of care ordinarily exercised under the circumstances, at the time of the act complained of, by health care providers in the field or specialty in which the defendant is practicing;

serts that the trial court prevented her from proving this theory when it excluded relevant evidence revealing that Dr. O'Malley had repeatedly failed examinations for board certification in surgery.[3]

Rule 402 of the Alaska Rules of Evidence provides that, "[w]ith certain exceptions, '[a]ll relevant evidence is admissible.'"[4] But among the recognized exceptions to this rule of general admissibility, the rules of evidence incorporate provisions allowing courts to exclude relevant evidence whose probative value is outweighed by its potential to prejudice or confuse the jury[5] and evidence of character or conduct whose primary purpose is "to show that [a] person acted in conformity therewith" on a specific occasion.[6]

Here, Marsingill correctly posits that Alaska's medical malpractice statute allows a finding of liability when a physician's lack of skill or knowledge proximately causes injury to a patient;[7] but she incorrectly reasons that Dr. O'Malley's failure to achieve board certification is relevant and admissible to prove that a specific defect in knowledge or skill caused him to injure Marsingill on the occasion at issue.

■ Since licensed physicians are allowed to practice surgery in Alaska without board certification, a physician's inability to pass one or more board certification tests does not necessarily tend to prove that the physician lacks minimally necessary surgical skills or knowledge. Thus, even if Marsingill's expert

witnesses might have been willing to testify as to their personal opinion that a competent general surgeon should possess knowledge and skill necessary to receive board certification, the trial court correctly recognized that this testimony would be irrelevant under Alaska law. For by adopting as a matter of public policy a medical licensing standard that authorizes physicians to perform general surgery without obtaining board certification, Alaska law establishes a baseline standard that precludes expert witnesses from dictating a more rigorous certification requirement.[8]

To prevail on her malpractice claim, then, Marsingill needed to make a more particularized showing that Dr. O'Malley lacked specific knowledge or skills that a competent surgeon would need regardless of board certification. Notably, the trial court gave Marsingill broad latitude to ask questions and introduce evidence for the purpose of showing that Dr. O'Malley did not know the common signs and symptoms of a bowel obstruction and that this particular lack of knowledge fell below the accepted standard of professional competence. Her ability to introduce this evidence gave Marsingill ample opportunity to present her malpractice claim to the jury. Considering the totality of the circumstances, we hold that it was not an abuse of discretion to grant Dr. O'Malley's pretrial motion to exclude evidence of his failed at-

> (2) that the defendant either lacked this degree of knowledge or skill or failed to exercise this degree of care; and
> (3) that as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

**3.** We review decisions excluding evidence for abuse of discretion. *Anchorage Nissan, Inc. v. State,* 941 P.2d 1229, 1238 n. 17 (Alaska 1997); *Agostinho v. Fairbanks Clinic P'ship,* 821 P.2d 714, 716 n. 2 (Alaska 1991). An abuse of discretion occurs only "when we are left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling." *Peter Pan Seafoods v. Stepanoff,* 650 P.2d 375, 378–79 (Alaska 1982).

**4.** *Cummings v. Sea Lion Corp.,* 924 P.2d 1011, 1017 (Alaska 1996) (quoting Alaska R. Evid.

402). Rule 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

**5.** Alaska R. Evid. 403.

**6.** Alaska R. Evid. 404(b); *accord* Alaska R. Evid. 404(a).

**7.** *Trombley v. Starr Wood Cardiac Group PC,* 3 P.3d 916, 918, 920 (Alaska 2000).

**8.** *See Jackson v. Buchman,* 338 Ark. 467, 996 S.W.2d 30, 34 (1999) ("[B]oard certification is not required by law to practice surgery in Arkansas. Accordingly, the legal standard of care set out in [the Arkansas malpractice statute] is in no way affected by board certification.").

tempts to pass the test for board certification in general surgery.

After the trial court granted Dr. O'Malley's pretrial motion to exclude this evidence, Marsingill repeatedly sought its admission during the course of trial, maintaining that Dr. O'Malley and his experts opened the door to its use to impeach and contradict their testimony. The trial court consistently declined to admit the evidence. Marsingill now challenges the trial court's rulings, renewing the arguments she raised below.

▮ We begin by acknowledging that Marsingill's arguments on these points present close issues. As already noted above, courts generally disfavor admission of evidence showing that a defendant failed board certification tests when that evidence is affirmatively offered to prove lack of professional knowledge or skill. But courts also recognize that considerably greater latitude exists to admit such evidence through cross-examination or in rebuttal when it counteracts affirmative defense evidence introduced to show a special degree of skill, knowledge or relevant expertise.[9] Yet at the same time, appellate courts addressing issues of admissibility in this area have consistently emphasized the need for great deference to the trial court's superior ability to determine whether particular evidence would have been more probative than prejudicial in a given case.[10]

▮ Here, Marsingill first claimed that Dr. O'Malley opened the door during a portion of his own testimony that occurred shortly after one of Marsingill's expert witnesses who was from England—Dr. Modlin—had finished testifying. When asked if he was board certified by the American College of Surgeons, Dr. O'Malley answered: "No, I'm not." He then added, "Neither is

Dr. Modlin." Marsingill argued that, in giving this unsolicited response, Dr. O'Malley unfairly attempted to portray himself as being equally qualified with Dr. Modlin, when in fact Dr. Modlin is board certified in the United Kingdom and thus is accepted by the American College of Surgeons as having the equivalent of board certification in the United States.

Although the trial court denied Marsingill's request to refute Dr. O'Malley's unsolicited response with examination concerning his failures to pass the board certification test, the court did expressly allow Marsingill to correct any misleading impression through further questioning about the nature of Dr. Modlin's United Kingdom board certification and by confirming that Dr. O'Malley had no comparable qualifications.

Marsingill argues that Dr. O'Malley's statement was a gratuitous and improper attempt to mislead the jury. Since this is one reasonably possible view of the statement, the trial court might have had discretion to allow inquiry into Dr. O'Malley's board failures. But the trial court's alternative approach to the issue effectively prevented Dr. O'Malley from creating any misleading impression; and at the same time it avoided taking recourse in a remedy that would have answered one impropriety with yet another. On balance, we cannot say that the trial court abused its discretion in finding that Dr. O'Malley did not open the door in this instance.

▮ Marsingill also attempted to introduce the board certification evidence to impeach what she claimed were Dr. O'Malley's attempts to portray himself as extensively qualified. Specifically, Dr. O'Malley testified on direct examination that he had operating privileges at all area hospitals and covered

---

9. *See, e.g., Campbell v. Vinjamuri,* 19 F.3d 1274, 1277 & n. 2 (8th Cir.1994); *Gipson v. Younes,* 724 So.2d 530, 532 (Ala.Civ.App.1998) ("[W]hen a physician sued for malpractice testifies as an expert, the fact that he had failed a board certification examination is relevant to his credibility as an expert."); *McCray v. Shams, M.D.,* 224 Ill.App.3d 999, 167 Ill.Dec. 184, 587 N.E.2d 66, 70 (1992) (stating that failure to pass boards was material issue in examination of expert witness "because it bore on whether she was qualified to meet the standards of the specialty").

10. *See Gipson,* 724 So.2d at 533 ("We have reviewed a number of decisions from other jurisdictions in which the courts have been required to determine whether a physician who testifies as an expert witness may be cross-examined about his failure to pass a board certification exam. The decisions are virtually unanimous in upholding the trial court's determination-regardless of whether the determination resulted in admission or in exclusion of the evidence.").

for virtually every surgeon in Anchorage; that he directed both the trauma center at Alaska Regional Hospital and the burn unit at Providence Hospital; that he received out-of-state referrals based on his expertise with burn patients; and that he had been contacted by the television program NOVA about filming a segment on treating frostbite patients. Marsingill argued that this testimony went "far beyond [Dr. O'Malley's] basic licensure qualifications," that it affirmatively raised the issue of Dr. O'Malley's general expertise as a surgeon, and that it thereby entitled Marsingill to impeach these claims by questioning Dr. O'Malley about his repeated failures to become board certified.

Dr. O'Malley rejoined that his testimony simply gave "general background information" and would not be perceived as asserting any extraordinary level of skill; moreover, he emphasized, the special expertise that he described was in the area of treating frostbite, not in gastro-intestinal surgery. The trial court found this argument persuasive and declined to allow impeachment through evidence of Dr. O'Malley's board failures.

It is a close question whether Dr. O'Malley's testimony exceeded the scope of the superior court's pretrial order, which limited the scope of testimony that both parties could present covering Dr. O'Malley's education and training. Thus, while inquiring into Dr. O'Malley's board failures would have been permissible as impeachment, we again must conclude that the trial court did not abuse its broad discretion in excluding that evidence. Under Evidence Rule 403, the trial court bears primary responsibility for determining admissibility of evidence by balancing its probative value evidence against its potential to create undue prejudice and confusion. Since the areas of expertise that Dr. O'Malley mentioned on direct examination were not germane to the areas at issue in Marsingill's claim, we cannot say as a matter of law that the probative value of Marsingill's proposed impeaching evidence outweighed its potential for causing prejudice and confusion.

■ Finally, Marsingill sought to use the board certification evidence to impeach various statements by Dr. O'Malley's experts regarding Dr. O'Malley's general qualifications—particularly an opinion expressed by Dr. Gardiner that Dr. O'Malley is not deficient in knowledge or skills and an opinion by Dr. Moossa that Dr. O'Malley has the requisite level of surgical skill, as well as the judgment and knowledge to handle difficult problems. But as with the previous evidentiary decisions, the trial court's broad discretion to assess the admissibility and likely prejudicial impact of evidence precludes us from saying that the court abused its discretion.[11]

**B. Jury Instructions Concerning the Standard for Deciding Breach of Duty To Disclose**

■ Marsingill next claims that the trial court erred in rejecting her proposed jury instructions regarding Dr. O'Malley's duty to give her adequate information during the February 14 phone call. As previously mentioned, Marsingill pursued two alternative theories of liability at trial that remain relevant on appeal. Under the first theory, she claimed that Dr. O'Malley lacked sufficient knowledge and skill to advise her properly as to her treatment choices and that these deficiencies caused him to commit malpractice by giving her deficient advice. Under the second theory, Marsingill claimed that a physician owes a duty to give patients enough information to make intelligent treatment choices. Marsingill claimed that Dr. O'Malley breached this duty of disclosure by failing to adequately inform her about the potential seriousness of her symptoms and the risks of failing to seek immediate examination and emergency room treatment.

■ Marsingill proposed separate jury instructions covering these theories. Her proposed instruction on her claim for failure to inform would have directed the jury that the question whether Dr. O'Malley breached his duty to give her sufficient information

11. *See, e.g., Campbell,* 19 F.3d at 1277; *Hinson v. Clairemont Cmty. Hosp.,* 218 Cal.App.3d 1110, 267 Cal.Rptr. 503, 510–12 (Cal.App.1990).

must be measured from the standpoint of the "reasonable patient." The trial court rejected this instruction and instead used a single instruction for both the medical malpractice theory and duty-to-inform theory. Although this instruction advised the jury of the separate factual basis underlying each of Marsingill's theories, it effectively treated both as medical malpractice claims, requiring the jury to determine whether Dr. O'Malley had given Marsingill sufficient evidence to meet his duty to inform by relying exclusively on expert testimony concerning whether the doctor's advice breached the professional standard of care. Marsingill challenges the trial court's ruling, asserting that the "reasonable patient" standard should have governed the jury's determination of whether Dr. O'Malley breached his duty to give her enough information to make an intelligent treatment choice.[12] We agree.

Marsingill's alternate theory of liability did not question the competency of any medical care or treatment administered by Dr. O'Malley and so did not depend on whether he breached the professional standard of care that governs a general surgeon; rather it questioned the adequacy of the information that he disclosed concerning Marsingill's treatment options, asserting that the doctor owed her a duty of disclosure and that he breached this duty. Our decisions have previously distinguished between the standard that governs a physician's duty to render adequate care and the standard that governs a physician's duty to disclose or inform. We first noted the distinction in *Pedersen v. Zielski:*

> The physician-patient relationship is one of trust. Because the patient lacks the physician's expertise, the patient must rely on

the physician for virtually all information about the patient's treatment and health. A physician therefore undertakes, not only to treat a patient physically, but also to respond *fully* to a patient's inquiry about his treatment, i.e., to tell the patient everything that a reasonable person would want to know about the treatment.[13]

Elaborating further on this distinction in *Korman v. Mallin,*[14] we noted that Alaska's informed consent statute[15] requires physicians to disclose the common risks and reasonable alternatives to a proposed treatment or procedure but fails to specify what standard governs the scope of the disclosure requirement.[16] After observing that the law traditionally measured a physician's duty to disclose "by the professional standard in the field," *Korman* rejected that approach in favor of "the modern trend" of case law, which "measure[s] the physician's duty of disclosure by what a reasonable patient would need to know in order to make an informed and intelligent decision."[17]

*Korman* went on to hold that expert testimony does not play a determinative role in the context of the reasonable patient rule: "Under this modern view, expert testimony concerning the professional standard of disclosure is not a necessary element of the plaintiff's case because the scope of disclosure is measured from the standpoint of the patient."[18] Emphasizing that "a physician must disclose those risks which are 'material' to a reasonable patient's decision concerning treatment,"[19] *Korman* borrowed from the Louisiana Supreme Court's decision in *Hondroulis v. Schuhmacher*[20] to explain that, although expert testimony remains relevant

---

12. The sufficiency of proposed jury instructions is a legal question to which we apply our independent judgment. *Fairbanks N. Star Borough v. Kandik Constr. Inc.,* 795 P.2d 793, 797 (Alaska 1990), *vacated in part on other grounds,* 823 P.2d 632 (Alaska 1991); *Chenega Corp. v. Exxon Corp.,* 991 P.2d 769, 775 (Alaska 1999) ("A legally erroneous instruction warrants reversal only when it prejudices a party—that is, when 'substantial rights of the parties were affected or the error had substantial influence.' ") (internal citations omitted).

13. 822 P.2d 903, 909 (Alaska 1991).

14. 858 P.2d 1145 (Alaska 1993).

15. *See* AS 09.55.556(a).

16. *Korman,* 858 P.2d at 1148.

17. *Id.* at 1148–49.

18. *Id.* at 1149.

19. *Id.*

20. 553 So.2d 398 (La.1989).

in narrowing the field of risks that are potentially material, materiality itself must ultimately be judged by asking what a reasonable patient would want to know:

> The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. "Some" expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of its occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type of harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient's position would attach significance to the specific risk. This determination does not require expert testimony.[21]

In the present case, Marsingill insists that *Korman*'s reasonable patient rule—not the professional standard of care in the field—governed the scope of Dr. O'Malley's duty to give her enough information to enable her to make an intelligent treatment decision.[22] Dr. O'Malley responds that neither *Korman* nor Alaska's informed consent law should extend to this case because the duty of disclosure they describe "simply does not apply unless the physician recommends or proposes a specific treatment or procedure."[23] According to Dr. O'Malley, in the present case, "[t]he factual predicate for the ... duty to disclose, i.e., a recommended treatment or procedure is totally absent." Hence, Dr. O'Malley contends, "Marsingill's theory that Dr. O'Malley failed to adequately appreciate and communicate the seriousness of her condition was properly included in the ordinary medical negligence instruction."

But on the particular facts of this case, Dr. O'Malley's position is unpersuasive. We assume for present purposes that Dr. O'Malley is correct in asserting that *Korman* and Alaska's implied consent statute both extend only to situations involving recommendations for specific medical procedures and treatment. Yet when Marsingill called Dr. O'Malley on the night of February 14, she was seeking a recommendation for treatment of her abdominal pain and distress. Uncontradicted evidence establishes that Dr. O'Malley advised her to go to the emergency room for treatment that would likely entail having a nasogastric tube inserted into her stomach. And despite Dr. O'Malley's argument to the contrary, the record supports the conclusion that this advice amounted to a recommendation for treatment.[24]

■ Furthermore, there was evidence that Dr. O'Malley acquiesced in Marsingill's decision not to go to the emergency room. In the context of a pre-existing patient/physician relationship involving post-operative care, a physician's recommendation to do nothing in the face of threatening symptoms is the equivalent of a treatment recommendation and should be accompanied by a duty of disclosure. A physician's acquiescence in a patient's decision not to seek treatment in the same circumstances should likewise be regarded as equivalent to a treatment recommendation subject to the same duty.

As we have previously mentioned, Section 8.08 of the AMA Code of Medical Ethics gives rise to a duty of disclosure in such situations, requiring that patients be given "enough information to enable an intelligent

---

**21.** *Korman,* 858 P.2d at 1149 (quoting *Hondroulis,* 553 So.2d at 412).

**22.** Marsingill also cites California cases in support of her position, primarily *Truman v. Thomas,* 27 Cal.3d 285, 165 Cal.Rptr. 308, 611 P.2d 902 (1980), and *Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 502 P.2d 1 (1972).

**23.** Dr. O'Malley discusses cases from California and New Jersey in support of this proposition. *See, e.g., Arato v. Avedon,* 5 Cal.4th 1172, 23 Cal.Rptr.2d 131, 858 P.2d 598, 605 (1993); *Scalere v. Stenson,* 211 Cal.App.3d 1446, 260 Cal.

Rptr. 152 (1989); *Farina v. Kraus,* 333 N.J.Super. 165, 754 A.2d 1215, 1223–24 (1999); *Eagel v. Newman,* 325 N.J.Super. 467, 739 A.2d 986, 989–90 (1999).

**24.** Dr. O'Malley asserts that one of Marsingill's experts, Dr. Ravden, "admitted" that "simply going to the hospital is neither a treatment or procedure." Yet this argument neglects to mention that Dr. Ravden expressly identified nasogastric intubation as a procedure "used in the treatment of a bowel obstruction."

choice." All six expert witnesses at trial agreed that this duty to inform applied in Marsingill's case. Indeed, even Dr. O'Malley conceded that the duty attached, expressly acknowledging that he had an "obligation to give [Marsingill] enough information so that she could make an intelligent choice as to whether she should go to the emergency room." Hence, no one disagreed that a duty of reasonable disclosure existed—that Dr. O'Malley did in fact have a duty to give Marsingill enough information to make an intelligent choice about immediately going to the emergency room for treatment; the only significant disagreement centered on issues concerning the scope and breach of the duty to inform.[25]

Yet these are precisely the issues that *Korman* describes as lying outside the realm of professional expertise and as falling within the fact-finding powers that the reasonable patient rule assigns to lay jurors. In denying the request for an instruction on the reasonable patient standard, then, the superior court deprived Marsingill of her right to have the jury decide the issue directly, from the standpoint of a reasonable patient. The court instead required the jury to filter its decision through the experts' views of what patients should be told. Because the instructions hinged the determination of breach entirely on the testimony of competing experts rather than on the common sense and experience of the jury, we must conclude that giving those instructions amounted to reversible error.[26]

## IV. CONCLUSION

 The judgment is VACATED, and this case is REMANDED for a new trial on Marsingill's claim for breach of the duty to provide enough information to allow her to make an intelligent treatment choice. On remand, the jury must be instructed to decide the claim from the standpoint of a reasonable patient.[27]

EASTAUGH, Justice, not participating.

---

**25.** The consensus of testimony agreeing that this duty of disclosure arose in the present setting makes it unnecessary for us to determine whether Alaska's informed consent statute would have independently encompassed the duty had Section 8.08 not applied.

**26.** Dr. O'Malley cursorily argues that if any error occurred on this point it was harmless because the factual similarity between Marsingill's medical malpractice and failure-to-inform theories of liability rendered any difference between the two theories immaterial. But this argument is unpersuasive, for, as *Korman* expressly recognizes, the differences in the standards that govern the jury's determination of breach make these theories significantly different. Although Dr. O'Malley further contends that Marsingill "conceded that she could argue her theory within the confines of the general medical malpractice instruction," this argument misstates the concession: While acknowledging that the malpractice instruction actually given allowed her to argue her factual theory, Marsingill specifically objected that the instruction would deprive her of the right to have her theory decided under the correct legal standard.

**27.** Because our decision on the standard for determining a breach of the duty to disclose requires a remand for retrial, we need not resolve Marsingill's remaining claims of error. To provide appropriate guidance on remand, however, we think it necessary to comment on two aspects of the remaining claims.

First, Marsingill argues that reversible error occurred when Dr. O'Malley's trial counsel argued in his closing argument to the jury that "plaintiff is asking you to basically take everything he's worked for his whole life, to ruin his reputation as a physician. That's unbelievable." Although we need not decide if this comment amounted to reversible error, we believe that it could readily have been understood as an improper suggestion that a judgment awarding damages against Dr. O'Malley would not be covered by his insurance.

Second, Marsingill argues that the superior court erred in denying her motion for a new trial, which was based on the jury's alleged confusion regarding an aspect of the jury instructions. Because this issue emerged from a post-trial interview with jurors conducted by a paralegal who worked for Marsingill's trial counsel and was supported by the paralegal's affidavit, we take this opportunity to remind counsel that Evidence Rule 606(b) flatly prohibits parties from questioning jurors as to any matter influencing their deliberations except "on the question whether *extraneous* prejudicial information was improperly brought to the jury's attention or whether any *outside* influence was improperly

brought to bear upon any juror." Alaska R. Evid. 606(b) (emphasis added). The rule likewise categorically bars the receipt of "evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying."