WHITE ET AL., APPELLEES, *v.* LEIMBACH, APPELLANT.

[Cite as *White v. Leimbach,* 131 Ohio St.3d 21, 2011-Ohio-6238.]

*In a lack-of-informed-consent case, expert medical testimony is required to establish both the material risks and dangers inherently and potentially involved with a medical procedure and that an undisclosed risk or danger actually materialized and proximately caused injury to the patient—Expert medical testimony is not required to establish what a reasonable person in the position of a patient would have done had the material risks and dangers been disclosed prior to therapy.*

(No. 2010-0988—Submitted April 6, 2011—Decided December 8, 2011.)

APPEAL from the Court of Appeals for Franklin County,

No. 09AP-674, 2010-Ohio-1726.

_____

**SYLLABUS OF THE COURT**

The tort of lack of informed consent is a medical claim, and therefore expert medical testimony is required to establish both the material risks and dangers inherently and potentially involved with a medical procedure and that an undisclosed risk or danger actually materialized and proximately caused injury to the patient, but is not necessary to establish what a reasonable person in the position of a patient would have done had the material risks and dangers been disclosed prior to therapy because that is a separate issue for jury consideration.  (*Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 17 OBR 281, 477 N.E.2d 1145, followed and explained.)

_____

**O'DONNELL, J.**

{¶ 1} Warren H. Leimbach II, M.D., appeals from a judgment of the Tenth District Court of Appeals, which reversed the trial court's grant of a directed verdict in his favor in an action seeking recovery for injuries following a medical procedure he performed on Robert N. White, allegedly without informed consent. At issue in this appeal is whether a claimant must present expert testimony on each element of the cause of action for failure to obtain informed consent to establish a prima facie case.

{¶ 2} The cause of action for a physician's failure to obtain informed consent is a medical claim, and a patient bears the burden to present expert medical testimony identifying the material risks and dangers of the medical procedure and showing that one or more of those undisclosed risks and dangers materialized and proximately caused injury. Expert testimony is necessary because these elements of the tort require the knowledge, training, and experience of a medical expert to assist the jury in rendering its verdict.

{¶ 3} Here, Robert and Mary White filed suit against Leimbach, alleging that he performed a second discectomy on Robert without obtaining his informed consent. The trial court directed a verdict in Leimbach's favor, finding that the Whites failed to present expert testimony concerning whether the material risks and dangers of the surgery Leimbach performed on Robert White actually materialized and proximately caused injury, but the court of appeals vacated that verdict. However, the record reveals that the trial court properly directed a verdict against the Whites. Accordingly, we reverse the judgment of the court of appeals and reinstate the verdict entered by the trial court in favor of Leimbach.

## Facts and Procedural History

{¶ 4} In early 1998, Robert White developed a throbbing, aching pain that radiated from his lower back down to his knee. He consulted with Leimbach, a neurological surgeon, who diagnosed White with a herniated disc in the L5-S1

2

region of his back that pushed against a nerve root and innervated down the leg, causing pain. White unsuccessfully tried physical therapy to alleviate his pain, and he therefore elected to undergo a discectomy to repair the herniated disc. Leimbach told White that he had a 90 to 95 percent chance that his condition would be better after the surgery, a 4 to 5 percent chance that there would be no improvement in his condition, and a less than 1 percent chance that the surgery would make his condition worse.

{¶ 5} White obtained a second opinion from Dr. Michael E. Miner, who informed him of the risks of the procedure and recommended it.

{¶ 6} On March 10, 1998, Leimbach performed the discectomy, which eliminated White's pain, and the following June, White returned to his heavy-labor job with no limitations or restrictions.

{¶ 7} In August of that year, however, White fell while running through a hotel parking lot, reinjured his back, and began to feel the same pain he experienced prior to surgery. Although taking pain medication and applying heat provided some relief, White returned to Leimbach, who determined that White had herniated the same disc and recommended a second discectomy at the L5-S1 level.

{¶ 8} Leimbach understood that a second discectomy presented a greater risk of a bad outcome, because scar tissue from the prior surgery would make avoiding nearby nerves more difficult, and damaging the nerves could result in chronic pain. Leimbach testified that he knew of his duty to inform White of the increased risk of a poor outcome prior to obtaining consent for the second surgery, and he further testified that he discussed this risk with White.

{¶ 9} White sought a second opinion from Miner, who recommended the second discectomy and believed that White had a high probability of a good outcome because of the positive result obtained from the first surgery and because Miner did not expect that much scar tissue would have formed during the short

time since the first surgery. Nonetheless, Miner testified that although the first discectomy had about a 90 percent chance of producing a good outcome, he believed that the second discectomy had only an 80 percent chance of benefiting White.

{¶ 10} Miner also testified that it is his custom to inform patients of the risks and benefits of a course of treatment, even if they consult with him only for a second opinion. Thus, he explained, he would have informed White of the potential complications of a second discectomy, including nerve damage and chronic pain.

{¶ 11} White disputed that either Leimbach or Miner had warned him that a second discectomy posed a greater risk of an adverse outcome than the first discectomy, and he testified that if he had been advised that repeating the surgery posed a significant risk not present in the first surgery, he would not have consented to the second surgery.

{¶ 12} Leimbach performed the second discectomy on October 23, 1998. His postoperative report noted that he did not discover any herniated disc material, and although he found significant scar tissue and removed it from the nerve root, he did not observe any complications from the procedure. Nonetheless, White awoke from anesthesia in pain, feeling a constant, sharp throb that radiated from the top of his hip down to his foot. Not only did the pain no longer stop at his knee, but it also felt more intense, and White described his foot as feeling "raw to the touch" and "like someone took a knife and peeled all the skin off of it." His injury prevented him from being able to wear a sock or a regular shoe and required stronger painkillers.

{¶ 13} Leimbach wrote in his postoperative office note that "[White] indeed still has a lot of pain in the leg even after the second surgery. I was very disappointed with the second surgery because when I got in there I really found no herniated disk. Everything was flush on the floor of the canal and there is a lot

4

of scar tissue which I had to dissect off the root and it did not surprise me he still has a lot of pain and throbbing in that leg and a lot of burning pain in the foot there. He cannot even stand to have his foot in the shoe without a great deal of discomfort. There are no bowel or bladder problems. The left leg is fine. That is what I was afraid of with the scar tissue and the second operation and we just made it worse."

{¶ 14} On April 7, 2003, Robert and Mary White filed a complaint against Leimbach alleging that he had failed to obtain informed consent before performing the second discectomy on White. The case proceeded to trial in June 2009.

{¶ 15} Miner appeared as a fact witness and as an expert witness for Leimbach. He testified that according to the medical records, none of the material risks of a second discectomy had materialized and that he saw no indication that Leimbach had made White's pain any worse. Rather, Miner attributed White's injury to his fall in the parking lot, along with other degenerative problems in his back and the multiple treatments White had undergone. While he acknowledged that White displayed symptoms of causalgia, which included the raw, burning pain White felt in his foot following the procedure, Miner indicated that those symptoms sometimes appear when there has been no indication of trauma to the nerve, and he stated, "[I]t's hard to blame the surgeon or the knife or any reasonable cause, but it does occur."

{¶ 16} Similarly, Dr. Gary Rea testified that in his opinion, White's fall had injured the nerve, causing White's constant pain. Rea emphasized that the second discectomy had presented White with an 80 to 85 percent chance of a good outcome, and he indicated that White's symptoms suggested that the second surgery may even have had as high a probability of benefiting White as the first surgery. Although Rea testified on cross-examination that the risks associated with a second discectomy should be explained to the patient in obtaining informed

consent, he did not consider there to be a substantial risk of injuring the nerve for either the first discectomy or the second. He stated that "[t]here is some difference. But it is not like some things we do where there is a 60 percent risk. There is some increased risk, but it is a relative increase."

{¶ 17} Rea further explained that "the pain that [White] has after the surgery, just as the pain he [had] before the surgery, is largely due to the fall and the tethered nerve root. And I think that is the source of this long term pain." But he also admitted that any new symptoms following the second discectomy "could be" attributed to the surgery, and he agreed that the surgery was the "most likely cause."

{¶ 18} At the close of evidence, the trial court directed a verdict in favor of Leimbach, concluding that the Whites had failed to show that an undisclosed risk or danger had actually materialized and proximately caused injury. The Whites appealed, and in a divided decision—one judge concurring in judgment only and one judge dissenting—the Tenth District vacated the trial court's judgment and remanded the cause to the trial court for further proceedings.

{¶ 19} Leimbach appealed to this court, contending that because the Whites' claim is a medical claim, they had the burden to present expert testimony to establish the elements of failure to obtain informed consent, including expert testimony identifying the material risks of the surgery and showing that one or more of those risks materialized and proximately caused White's additional pain. According to Leimbach, there is no expert testimony in the record showing that an undisclosed risk materialized and proximately caused White harm.

{¶ 20} The Whites respond that they presented sufficient evidence on each element of the informed-consent claim, such that the trial court should have allowed the jury to decide the question. They rely on Leimbach's own testimony that the second discectomy posed a significant known risk that should have been disclosed as well as his postsurgical note that the surgery made White's condition

worse. They also emphasize White's testimony that the surgery resulted in immediate and increased pain and that he would not have gone forward with the surgery had he known about the increased risk of an adverse result from a second discectomy. Further, the Whites point to Rea's testimony that the surgery represented the most likely cause of the raw, burning pain in White's foot. Although they maintain that expert testimony is not necessary to establish each element of an informed-consent claim, they emphasize that the record contains sufficient expert testimony to support their position.

{¶ 21} Accordingly, we are concerned with whether expert testimony is required to prove the elements of an informed-consent claim, and if so, whether the Whites met their burden of production so as to establish a jury question in this case.

**Law and Analysis**

*Standard of Review*

{¶ 22} Because the trial court's decision to grant a motion for a directed verdict involves a question of law, our review is de novo. *Goodyear Tire & Rubber Co. v. Aetna Cas. & Sur. Co.*, 95 Ohio St.3d 512, 2002-Ohio-2842, 769 N.E.2d 835, ¶ 4. As we explained in *Goodyear Tire*, "a motion for directed verdict is granted if, after construing the evidence most strongly in favor of the party against whom the motion is directed, 'reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party.' The 'reasonable minds' test mandated by Civ.R. 50(A)(4) requires the court to discern only whether there exists any evidence of substantive probative value that favors the position of the nonmoving party." Id. at ¶ 3, quoting Civ.R. 50(A)(4).

*The Duty to Obtain Informed Consent*

{¶ 23} At common law, courts recognized a cause of action for battery when a medical provider failed to obtain informed consent from the patient prior

to performing a surgical procedure. Keeton, Dobbs, Keeton & Owen, Prosser and Keeton on the Law of Torts (5th Ed.1984) 189-190, Section 32; Dobbs, The Law of Torts (2000) 654, Section 250; see also *Lacey v. Laird* (1956), 166 Ohio St. 12, 1 O.O.2d 158, 139 N.E.2d 25, paragraph one of the syllabus (explaining that a surgical procedure performed without proper consent is an assault and battery). The doctrine of informed consent emerged in the context of the tort of battery because courts treated the failure to obtain informed consent as vitiating the patient's consent to the procedure; however, "it began to be recognized that the matter was really one of the standard of professional conduct, and so negligence has now generally displaced battery as the basis for liability." Prosser and Keeton on Torts at 190, Section 32.

{¶ 24} A cause of action premised on the failure of a physician to obtain informed consent is a "medical claim" as defined by R.C. 2305.113(E)(3), because it is a "claim that is asserted in [a] civil action against a physician * * * and that arises out of the medical diagnosis, care, or treatment of any person." Id.

{¶ 25} In *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 139, 17 OBR 281, 477 N.E.2d 1145, we set forth the elements of a cause of action for a physician's failure to obtain informed consent. We stated:

{¶ 26} "The tort of lack of informed consent is established when:

{¶ 27} "(a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;

{¶ 28} "(b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and

{¶ 29} "(c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy."

{¶ 30} In applying this test, Ohio adopted the reasonable-patient standard. Id., 17 Ohio St.3d at 139, 17 OBR 281, 477 N.E.2d 1145. We did not, however, fully explain the analysis that should accompany its application.

{¶ 31} The reasonable-patient standard requires that the scope of the physician's disclosure "be governed by the patient's informational needs." *Sard v. Hardy* (1977), 281 Md. 432, 442, 379 A.2d 1014. See also *Anderson v. Jones* (D.C.1992), 606 A.2d 185, 188, quoting *Crain v. Allison* (D.C.1982), 443 A.2d 558, 562. "The guide for disclosure is materiality." *Smith v. Shannon* (1983), 100 Wash.2d 26, 32, 666 P.2d 351, citing *Miller v. Kennedy* (1974), 11 Wash.App. 272, 287, 522 P.2d 852.

{¶ 32} In *Nickell*, we stated that "a risk is material when a reasonable person, in what the physician knows or should know to be the patient's condition, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed treatment." Id. at 139.

{¶ 33} Although the scope of disclosure is measured by the information a reasonable patient would need to know in order to make an informed and intelligent decision, the physician need not disclose every conceivable risk. Rather, the reasonable-patient standard requires that a physician disclose "only that information material to a reasonable patient's informed decision." *Matthies v. Mastromonaco* (1999), 160 N.J. 26, 36, 733 A.2d 456, citing *Largey v. Rothman* (1988), 110 N.J. 204, 211-212, 540 A.2d 504. Cf. *Sard*, 281 Md. at 442-446; *Canterbury v. Spence* (C.A.D.C.1972), 464 F.2d 772; *Carr v. Strode* (1995), 79 Hawaiʻi. 475, 486, 904 P.2d 489; *Festa v. Greenberg* (1986), 354 Pa.Super. 346, 353, 511 A.2d 1371, citing *Cooper v. Roberts* (1971), 220 Pa.Super. 260, 286 A.2d 647.

*The Requirement of Expert Testimony*

{¶ 34} In general, when a medical claim questions the professional skill and judgment of a physician, expert testimony is required to prove the relevant

standard of conduct. *Berdyck v. Shinde* (1993), 66 Ohio St.3d 573, 579, 613 N.E.2d 1014; *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 130, 75 O.O.2d 184, 346 N.E.2d 673 ("whether the physician and surgeon has proceeded in the treatment of a patient with the requisite standard of care and skill must ordinarily be determined from the testimony of medical experts").

{¶ 35} In the context of a claim for lack of informed consent, "[e]xpert testimony is necessary to establish the material risks and other pertinent information regarding the treatment or procedure." *Univ. of Maryland Med. Sys. Corp. v. Waldt* (2009), 411 Md. 207, 232, 983 A.2d 112; see also *Thibodeaux v. Jurgelsky* (La.2005), 898 So.2d 299, 314 ("To determine whether the non-disclosure was a material risk we must look to the testimony of the expert witnesses"); *Flatt v. Kantak* (2004), 2004 N.D. 173, 687 N.W.2d 208, ¶ 9 ("expert medical testimony is generally necessary to identify the material risks of treatment"); *Smith*, 100 Wash.2d at 33-34, 666 P.2d 351 (expert testimony is necessary to establish the existence of a risk).

{¶ 36} "[A]lthough expert testimony remains relevant in narrowing the field of risks that are potentially material, materiality itself must ultimately be judged by asking what a reasonable patient would want to know." *Marsingill v. O'Malley* (Alaska 2002), 58 P.3d 495, 503-504. Thus, expert medical testimony regarding the material risks and dangers inherently and potentially involved with a medical procedure is necessary to establish a prima facie case, but once provided with that information, the trier of fact decides the materiality of those risks.

{¶ 37} Accordingly, there are two considerations inherent in the first element set forth in *Nickell*: the material risks and dangers and the significance of those risks and dangers. Expert medical testimony is required to establish the material risks and dangers inherently and potentially involved with a medical

procedure, but what a reasonable patient would have done in light of these disclosed risks is determined by the trier of fact.

{¶ 38} Regarding the second element set forth in *Nickell*, expert medical testimony is also required to establish that an undisclosed risk or danger actually materialized and proximately caused injury to the patient. It is necessary to establish this element by expert medical testimony because it relates to issues beyond the common knowledge and understanding of a layperson. See *Gorney v. Meaney* (Ariz.App.2007), 214 Ariz. 226, 150 P.3d 799, ¶ 16 ("Such testimony helps to ensure that the plaintiff's alleged injury was not caused by the progression of a pre-existing condition or was the result of some other cause, such as natural aging or a subsequent injury"); *Posta v. Chung-Loy* (1997), 306 N.J.Super. 182, 204, 703 A.2d 368; *Reinhardt v. Colton* (Minn.1983), 337 N.W.2d 88, 96, citing *Cornfeldt v. Tongen* (Minn.1980), 295 N.W.2d 638, 640-641; *Harnish v. Children's Hosp. Med. Ctr.* (1982), 387 Mass. 152, 158, 439 N.E.2d 240 ("Whether the alleged undisclosed risk materialized is a medical question"); cf. *Ramage v. Cent. Ohio Emergency Servs., Inc.* (1992), 64 Ohio St.3d 97, 592 N.E.2d 828, at paragraph one of the syllabus (explaining that expert testimony is required to show that a medical provider's acts or omissions proximately caused injury).

{¶ 39} Further, an expert opinion relating to whether the risk materialized and proximately caused injury should be framed in terms of medical probability, not possibility. See *Roberts v. Ohio Permanente Med. Group, Inc.* (1996), 76 Ohio St.3d 483, 485, 668 N.E.2d 480 (noting the general rule that in medical-malpractice claims the plaintiff "must prove causation through medical expert testimony in terms of probability"); *Stinson v. England* (1994), 69 Ohio St.3d 451, 633 N.E.2d 532, paragraph one of the syllabus ("the admissibility of expert testimony that an event is the proximate cause is contingent upon the expression of an opinion by the expert with respect to the causative event in terms of

probability. * * * An event is probable if there is a greater than fifty percent likelihood that it produced the occurrence at issue").

{¶ 40} Although expert medical testimony is required to establish the material risks and dangers inherently and potentially involved with a medical procedure and to establish that an undisclosed risk or danger actually materialized and proximately caused injury to the patient, expert medical testimony is not necessary to establish what a reasonable person in the position of a patient would have done had the material risks and dangers been disclosed prior to therapy. The third element of *Nickell*, that a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers been disclosed, is a matter that falls within the comprehension of a layman. Thus, consistent with our opinion in *Nickell*, it is for the trier of fact to determine whether a reasonable person in the plaintiff's position would have attached significance to the undisclosed material risks and dangers inherently and potentially involved with the procedure and would have decided against the procedure.

{¶ 41} In this case, the record reveals that the Whites relied on Leimbach's admission and Miner's confirmation that a second discectomy poses a greater risk of nerve damage and that the patient should have been informed of this greater risk. However, both doctors testified that they warned White of all material risks of the second discectomy. White disputed their testimony and testified that neither doctor had informed him of the greater risk he faced, and he asserted that had he known of that risk from the second surgery, he would not have consented to that procedure.

{¶ 42} Regarding the second element, that the undisclosed risks materialized and proximately caused the injury, the Whites failed to meet their burden to produce expert testimony showing it to be more likely than not that the undisclosed greater risk of nerve damage from the second discectomy

materialized and proximately caused White's injury. Leimbach denied that it was likely that the surgery caused nerve damage, and he admitted only the *possibility* that the chronic pain could be related to either scar tissue or the surgery. His postoperative note that the second discectomy "made it worse" does not tend to prove that the surgery in fact caused the nerve damage.

{¶ 43} Further, White produced no expert testimony to the effect that the second surgery proximately caused the nerve damage. Miner and Rea opined that the second surgery did not harm White. Although each acknowledged the *possibility* that the second discectomy could have caused the nerve damage, neither doctor testified to a reasonable degree of medical certainty that the risk of nerve damage materialized and proximately caused injury in this case.

{¶ 44} White's contention that he produced expert testimony to establish proximate causation is not well taken because Rea's agreement with the statement on cross-examination that the second discectomy was the "most likely cause" of White's chronic pain does not prove to a reasonable degree of medical certainty that the surgery more likely than not caused the nerve damage. Testimony that the surgery is the most likely among other potential causes of nerve damage is not the equivalent of an opinion that the surgery *more likely than not* caused nerve damage, especially given Rea's testimony that the surgery did not affect White's condition.

{¶ 45} Thus, because there is no evidence to support the second element of White's informed-consent claim, the trial court properly directed a verdict in this case.

**Conclusion**

{¶ 46} The tort of lack of informed consent is a medical claim, and therefore expert medical testimony is required to establish both the material risks and dangers inherently and potentially involved with a medical procedure and that an undisclosed risk or danger actually materialized and proximately caused injury

to the patient, but is not necessary to establish what a reasonable person in the position of a patient would have done had the material risks and dangers been disclosed prior to therapy because that is a separate issue for jury consideration. If a patient fails to present medical expert testimony that it is more likely than not that an undisclosed risk of a surgical procedure actually materialized and proximately caused injury, then a trial court may properly grant a directed verdict. Accordingly, the judgment of the appellate court is reversed, and the verdict of the trial court is reinstated.

Judgment reversed.

O'CONNOR, C.J., and LUNDBERG STRATTON, LANZINGER, CUPP, and MCGEE BROWN, JJ., concur.

PFEIFER, J., concurs in judgment only.

--------------------

**PFEIFER, J., concurring.**

{¶ 47} I concur in the judgment in this case, but cannot join the majority opinion, because it flatly contradicts the case it purports to follow and explain, *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 17 OBR 281, 477 N.E.2d 1145. The majority's effective overruling of *Nickell* occurs in regard to the first element of the *Nickell* test, an element that is not even in dispute in this case.

{¶ 48} In *Nickell*, this court stated:

{¶ 49} "The tort of lack of informed consent is established when:

{¶ 50} "(a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;

{¶ 51} "(b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and

**{¶ 52}** "(c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy." *Nickell*, 17 Ohio St.3d at 139, 17 OBR 281, 477 N.E.2d 1145.

**{¶ 53}** The majority contradicts *Nickell* in regard to the first element of the test by holding that expert testimony is necessary to establish which risks of the procedure were material. This court held completely the opposite in *Nickell*. Here is the law as clearly set forth in *Nickell*:

**{¶ 54}** "One of our dilemmas in applying [the lack-of-informed-consent] test is the question of how far a doctor must go in establishing whether a potential danger, albeit improbably remote, is sufficiently material to require disclosure. To this end the reasonable patient standard is utilized. See Note, Informed Consent—A Proposed Standard for Medical Disclosure (1973), 48 N.Y.U.L.Rev. 548, 552-555. See, also, Prosser & Keeton, Torts (5 Ed.1984) 189-192. In the instant case the jury was properly instructed that ' * * * a risk is material when a reasonable person, in what the physician knows or should know to be the patient's condition, would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed treatment.' " Id.

**{¶ 55}** Thus, in *Nickell*, the court held that a trier of fact should employ a reasonable-patient standard in determining whether a risk is material—that is, whether a reasonable patient would attach significance to the risk in making a decision about whether to pursue treatment. A lack-of-informed-consent case is all about what a reasonable patient would have done had he been properly informed by his doctor about the risks of a treatment the doctor undertakes. It is completely within a juror's ken—without expert testimony—to know what a reasonable patient would want to hear from a doctor before undergoing treatment, what risks he would consider material. In other words, a juror is perfectly capable

of determining what a reasonable patient would want to know. He can simply ask, "Would I want to know that?"

{¶ 56} And that has been the law in Ohio. In this case, however, the majority holds that "expert medical testimony is required to establish * * * the material risks and dangers inherently and potentially involved with a medical procedure." Majority opinion at the syllabus. Again, this switch from established Ohio law comes in a case where materiality of the risk is not even an issue—the trial court directed a verdict in favor of the defendant because it held that the plaintiff had failed to present sufficient testimony to satisfy the *second* element of the *Nickell* test, that the undisclosed risk caused the injury at issue.

{¶ 57} In *Nickell*, by adopting the reasonable-patient standard in regard to the first element of the test, this court essentially held that a jury, after determining the risks of a procedure, must decide, without the necessity of expert testimony, whether the undisclosed risk would have been a significant factor for a reasonable person to consider in making a decision on whether to go forward with the procedure.

{¶ 58} Granted, this court did not explain in *Nickell* how a jury learns of the risks associated with a procedure. And in the underlying trial in *Nickell*, there was indeed expert testimony on the established risks associated with the procedure in question. *Nickell*, 17 Ohio St.3d at 139, 17 OBR 281, 477 N.E.2d 1145. As numerous courts have held, although the materiality of a procedure's risk is ultimately to be determined by applying a reasonable-patient standard, establishing what a procedure's risks *are* does require expert testimony. As the court stated in *Thibodeaux v. Jurgelsky* (La.2005), 898 So.2d 299, 314, this makes a determination of the material risks of a procedure, i.e., materiality, a two-step process:

{¶ 59} "This court has explained:

16

**{¶ 60}** " 'The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. "Some" expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type [of] harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient's position probably would attach significance to the specific risk. This determination of materiality does not require expert testimony.' *Hondroulis v. Schuhmacher*, on reh'g, 553 So.2d 398, 412 (La.1989)." See also *Cleary v. Group Health Assn., Inc.* (D.C.1997), 691 A.2d 148, 153-154; *Miller-McGee v. Washington Hosp. Ctr.* (D.C.2007), 920 A.2d 430, 440.

**{¶ 61}** Expert testimony narrows the "field of risks" that a jury may find to be material under the reasonable-patient standard. *Marsingill v. O'Malley* (Alaska 2002), 58 P.3d 495, 503-504. "Specifically, expert testimony is necessary to prove the existence of a risk, its likelihood of occurrence, and the type of harm in question. Once those facts are shown, expert testimony is unnecessary." *Smith v. Shannon* (1983), 100 Wash.2d 26, 34, 666 P.2d 351.

**{¶ 62}** Thus, the first element of the tort of lack of informed consent as set forth in *Nickell* may require expert medical testimony to establish the risks and dangers inherently and potentially involved with the medical procedure. Whether those risks were *material* in a given case, however, is for the jury to determine, applying the reasonable-patient standard.

**{¶ 63}** The majority opinion requires expert testimony to establish both the risks of the procedure and whether the risk was material. Case after case cited by the majority to support its position actually instead supports the widely held position that expert testimony is needed to establish the nature of the medical

risks, but is not needed to establish whether a specific risk is material. See, e.g., *Sard v. Hardy* (1977), 281 Md. 432, 447, 379 A.2d. 1014 ("We regard as more persuasive the reasoning of the cases that require neither the scope nor the breach of the physician's duty to be established by expert medical testimony"); *Crain v. Allison* (D.C.1982), 443 A.2d 558, 563 ("expert testimony is not needed to establish the scope of or the breach of the duty to inform one's patients before treating them"); *Smith*, 100 Wash.2d at 33, 666 P.2d 351 ("The determination of materiality is a 2-step process. Initially, the scientific nature of the risk must be ascertained, i.e., the nature of the harm which may result and the probability of its occurrence. * * * The trier of fact must then decide whether that probability of that type of harm is a risk which a reasonable patient would consider in deciding on treatment"); *Canterbury v. Spence*, 464 F.2d at 792 ("Experts are unnecessary to a showing of the materiality of a risk to a patient's decision on treatment, or to the reasonably, expectable effect of risk disclosure on the decision"); *Festa v. Greenberg* (1986), 354 Pa.Super. 346, 355, 511 A.2d 1371 ("The question of whether a physician disclosed risks which a reasonable man would deem material is for the trier of fact"); *Thibodeaux*, 898 So.2d at 314 (" 'This determination of materiality does not require expert testimony' "); *Marsingill* 58 P.3d at 503, quoting the two-step test quoted in *Thibodeaux*.

{¶ 64} It is appropriate to require expert testimony to establish the medical risks in a lack-of-informed-consent case. But risk assessment is different from the materiality assessment. A lack-of-informed-consent case is not purely a medical-malpractice case. The medical aspects of a lack-of-informed-consent case do require expert testimony, but whether a reasonable patient would have placed significance on the medical information a doctor allegedly failed to provide is a matter for the jury. A reasonable patient's response to medical information is an integral part of both the first element (whether the risk was material) and third

element (whether the patient would have refused the treatment had he or she been aware of the risk) of a *Nickell* claim.

{¶ 65} The majority, however, conflates the first and third elements of the *Nickell* test. It holds as to the *first* element of the *Nickell* test that "[e]xpert medical testimony is required to establish the material risks and dangers inherently and potentially involved with a medical procedure, but *what a reasonable patient would have done in light of these disclosed risks* is determined by the trier of fact." (Emphasis added.) Majority opinion at ¶ 37. What a reasonable patient would have done had the risks been disclosed, i.e., whether he would have opted to undergo the procedure, is the *third* element of a lack-of-informed-consent case. The first element considers whether the undisclosed information would have been significant in the decision-making process.

{¶ 66} The majority performs unnecessary surgery on *Nickell*. It stitches together contradictory case law in an avowed attempt to "fully explain the analysis that should accompany [the reasonable-patient standard's] application," majority opinion at ¶ 30, but instead guts *Nickell*'s reasonable-patient standard and creates something entirely different. Certainly, the majority means well. But so did Dr. Frankenstein.

{¶ 67} I do, however, concur in the judgment of the majority. The evidence in the record is, as the trial court held, insufficient to satisfy the second element of the *Nickell* test.

_____

Cooper & Elliott, L.L.C., Charles H. Cooper Jr., and Rex H. Elliott, for appellees.

Reminger Co., L.P.A., Martin T. Galvin, Brian T. Gannon, and Brian D. Sullivan, for appellant.

Bonezzi, Switzer, Murphy, Polito & Hupp Co., L.P.A., Bret C. Perry, and Jennifer R. Becker, urging reversal on behalf of amicus curiae, the Academy of Medicine of Cleveland and Northern Ohio.

_____