Julie **KORMAN**, Appellant,

v.

Robert E. **MALLIN**, Appellee.

No. S–4976.

Supreme Court of Alaska.

Sept. 3, 1993.

---

**1.** The doctrine of plain error is quite obviously    inapplicable.

Charles W. Ray, Jr., Anchorage, for appellant.

Sanford M. Gibbs, Hagans, Brown, Gibbs & Moran, Anchorage, for appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

MOORE, Chief Justice.

### I. *Introduction*

In this "informed consent" case, Julie Korman appeals the trial court's grant of summary judgment in favor of Dr. Mallin. Korman maintains that Dr. Mallin failed to establish, as a matter of law, that he adequately disclosed the risk of painful and unsightly scarring before Korman consented to elective breast reduction surgery.

In deciding this case, we address for the first time the scope of disclosure required by the "informed consent" doctrine under Alaska law. We conclude that a physician must disclose those risks and benefits of a proposed procedure which a reasonable patient would need to know in order to make an informed and intelligent decision. Applying this reasonable patient standard to the case at bar, we conclude that the trial court erred in granting summary judgment

on the record presented and remand this case for further proceedings.

## II. *Facts and Proceedings*

In April 1988 Julie Korman consulted Dr. Mallin, an Anchorage plastic surgeon, to inquire about a possible breast reduction operation. At this initial visit, Korman viewed two videotapes concerning breast reduction surgery.[1] Dr. Mallin then talked alone with Korman for approximately ten minutes about her needs and conducted a brief physical examination. After the examination, Dr. Mallin discussed the specific procedures with Korman in the presence of his medical assistant, Bari Lasky.

Dr. Mallin's office notes indicate that he told Korman about some of the risks of the procedure at this time.

Talked about infection, hemorrhage, nipple numbness, scars, possible need for implant to give upper fullness as well as nipple turning black and falling off.... Talked about how they heal in a different way, there can be allergies, infections, hemorrhage, numbness, scar capsules they would feel hard but get softer.

Lasky confirms that Dr. Mallin informed Korman of the risks of the procedure, including the risk of permanent scarring. In her deposition, Korman stated that in this discussion Dr. Mallin told her

about the scarring, about what I could expect; the results ... and ... a little bit about insurance.

Dr. Mallin then gave Korman pamphlets on reduction mammaplasty and breast implants to read at home.[2]

Korman visited Dr. Mallin's office on May 4 to complete the necessary consent forms. At this time, Dr. Mallin described the proposed surgery and drew a diagram of the operative procedure. While she was reading through the consent form, Korman states that she expressed concern over the risk of scarring and asked Dr. Mallin what she could expect. According to Korman, Dr. Mallin told her that there was no cause for concern.

His exact words to me were I've done—don't worry about it, I've done hundreds of these. The worst that has ever happened is I had a lady lose one of her nipples; but her breasts were very large. I think that you'll be happy with the results.

In her affidavit, Korman states that Dr. Mallin did not explain to her "that thickened or widened scars[ ] and extremely painful scars" could occur. She also states that he did not explain to her in this context that her risk of scarring was 50% greater because she was a smoker. However, Korman admits to reading the following paragraph in "Dr. Mallin's Surgery and Procedure Consent Form."

I am aware that all complications that have been told to me either verbal or written are increased by 50% because I smoke.

Lasky was also present during this discussion and stated in her affidavit that Dr. Mallin answered Korman's questions regarding her concerns of the risk of surgery and that Korman indicated that she understood the risks and that all of her questions were answered before she consented to the surgery. Wendy Brown, one of Dr. Mallin's office employees, witnessed Korman's execution of the consent forms and stated in her affidavit that Korman indicated that all of her questions regarding surgery were answered to her satisfaction and that

---

1. The first videotape, entitled "Realistic Expectations," provides a general overview of the risks and benefits of plastic surgery. The second videotape, entitled "Reduction Mammaplasty," focuses on the breast reduction procedure itself. Both videotapes emphasize that plastic surgery results in permanent scars and that the degree of scarring is unique to each patient.

2. The pamphlet on breast reduction provides the following information on scarring.

Although the surgeon makes every effort to keep scars as inconspicuous as possible, reduction mammaplasty scars are extensive and permanent. The patient must be willing to accept the change from large uncomfortable breasts without scars to small comfortable breasts with scars. Scars remain highly visible for a year following surgery, then fade to some degree.
Line drawings indicate the location of the incisions and resulting scars.

she understood that no guarantees were given to her concerning the outcome of the surgery.

Korman underwent surgery a few days later. She was very unhappy with the results—particularly the broad, wide and painful scars.

In April 1990 Korman filed this malpractice action against Dr. Mallin, alleging both medical negligence and lack of informed consent. Pursuant to AS 09.55.536, an Expert Advisory Board was appointed to review Korman's medical malpractice claim. In January 1991 the Board rendered its decision, finding that Korman had not been injured by Dr. Mallin's care. The Board did not address Korman's informed consent claim.

Following the Board's decision, Dr. Mallin moved for summary judgment in May 1991. Korman opposed this motion. After oral argument, Judge Hunt granted Dr. Mallin's motion, commenting that reasonable minds "could not differ [in concluding] ... that under the facts of this case [Korman] did give an informed consent, because she was advised of the scarring risk." This appeal followed.

III. *Discussion*

A. *Standard of Review*

In reviewing a grant of summary judgment, we will independently determine whether there were any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *Drake v. Hosley*, 713 P.2d 1203, 1205 (Alaska 1986). We must draw all reasonable inferences in favor of the nonmoving party and against the movant. *Swenson Trucking & Excavating, Inc. v. Truckweld Equip. Co.*, 604 P.2d 1113, 1116 (Alaska 1980).

B. *The Doctrine of Informed Consent*

Alaska Statute 09.55.556(a) provides that a physician is liable for failure to obtain the informed consent of a patient if

the claimant establishes by a preponderance of the evidence that the provider has failed to inform the patient of the common risks and reasonable alternatives to the proposed treatment or procedure, and that but for that failure the claimant would not have consented to the proposed treatment or procedure.

AS 09.55.556(a).

Although AS 09.55.556(a) states that a physician must disclose the *common risks* and *reasonable alternatives* to a proposed procedure, it does not set forth the standard by which this disclosure should be measured.[3] The legislative history is similarly silent on this issue. This is a question of first impression in Alaska.[4]

Traditionally, a physician's duty to disclose information concerning treatment has been measured by the professional standard in the field. *See, e.g., Potter v. Wisner*, 170 Ariz. 331, 333, 823 P.2d 1339, 1341 (App.1991); *Jacobs v. Painter*, 530 A.2d 231 (Me.1987). *See generally* Laurent B. Fantz, Annotation, *Modern Status of Views as to General Measure of Physician's Duty to Inform Patient of Risks of Proposed Treatment*, 88 A.L.R.3d 1008, 1020–27 (1978). This rule reflects the belief that holding a physician to a lay standard of disclosure would interfere with the flexibility a physician must have in determining what therapy would best suit the patient's needs. *See Ross v. Hodges*, 234 So.2d 905, 908–09 (Miss.1970). In order to establish a prima facie case, a plaintiff must usually present expert testimony of the professional standard of disclosure in the community and of the physician's failure to meet that standard. *See Culbertson*

---

3. *Compare* AS 09.55.540(a)(1) which requires a patient to establish the professional standard of care in the field or speciality as one element of a medical negligence claim.

4. Prior to the enactment of AS 09.55.556, this court specifically declined to reach "the difficult and complex questions ... regarding the duty and scope of disclosure required by the informed consent doctrine." *Poulin v. Zartman*, 542 P.2d 251, 275 (Alaska 1975) (holding that father of infant blinded after oxygen treatment failed to make out a prima facie informed consent claim because he failed to show that he would have declined the procedure if he had known of alternative treatment).

*v. Mernitz*, 602 N.E.2d 98, 102–04 (Ind. 1992) (expert testimony of professional standard of disclosure required except where deviation from the standard of care is a matter commonly known to lay persons); *see also* Daniel E. Feld, Annotation, *Necessity and Sufficiency of Expert Evidence to Establish Existence and Extent of Physician's Duty to Inform Patient of Risks of Proposed Treatment*, 52 A.L.R.3d 1084, 1091–92 (1973).

■ However, the modern trend is to measure the physician's duty of disclosure by what a reasonable patient would need to know in order to make an informed and intelligent decision. The Louisiana Supreme Court has articulated this standard as follows:

> The informed consent doctrine is based on the principle that every human being of adult years and sound mind has a right to determine what shall be done to his or her own body. Surgeons and other doctors are thus required to provide their patients with sufficient information to permit the patient to make an informed and intelligent decision on whether to submit to a proposed course of treatment. Where circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternate methods of treatment.

*Hondroulis v. Schuhmacher*, 553 So.2d 398, 411 (La.1989) (citations omitted). *See generally* Fantz, *supra*, at 1034–43. Under this modern view, expert testimony concerning the professional standard of disclosure is not a necessary element of the plaintiff's case because the scope of disclosure is measured from the standpoint of the patient.

■ Our recent comments on the nature of the physician-patient relationship echo the concerns outlined by the *Hondroulis* court.

The physician-patient relationship is one of trust. Because the patient lacks the physician's expertise, the patient must rely on the physician for virtually all information about the patient's treatment and health. A physician therefore undertakes, not only to treat a patient physically, but also to respond *fully* to a patient's inquiry about his treatment, i.e., to tell the patient everything that a reasonable person would want to know about the treatment.

*Pedersen v. Zielski*, 822 P.2d 903, 909 (Alaska 1991) (citations omitted). We are persuaded that the modern view is the better rule and hold that the scope of disclosure required under AS 09.55.556(a) must be measured by what a reasonable patient would need to know in order to make an informed and intelligent decision about the proposed treatment.

■ Under the reasonable patient rule, a physician must disclose those risks which are "material" to a reasonable patient's decision concerning treatment. *See Hondroulis*, 553 So.2d at 411; *Canterbury v. Spence*, 464 F.2d 772 (D.C.Cir.1972), *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).

> The determination of materiality is a two-step process. The first step is to define the existence and nature of the risk and the likelihood of its occurrence. "Some" expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of its occurrence. The second prong of the materiality test is for the trier of fact to decide whether the probability of that type of harm is a risk which a reasonable patient would consider in deciding on treatment. The focus is on whether a reasonable person in the patient's position would attach significance to the specific risk. This determination does not require expert testimony.

*Hondroulis*, 553 So.2d at 412.

■ We also note that, in certain circumstances, a physician's failure to disclose a risk may be privileged.

[T]he physician retains a qualified privilege to withhold information on therapeutic grounds, as in those cases where a complete and candid disclosure of possible alternatives and consequences might have a detrimental effect on the physical or psychological well-being of the patient, or where the patient is incapable of giving his consent by reason of mental disability or infancy, or has specifically requested that he not be told. Likewise the physician's duty to disclose is suspended where an emergency of such gravity and urgency exists that it is impractical to obtain the patient's consent. Finally disclosure is not required where the risk is either known to the patient or is so obvious as to justify presumption of such knowledge, nor is the physician under a duty to discuss the relatively remote risks inherent in common procedures, when it is common knowledge that such risks inherent in the procedure are of very low incidence. Conversely, where the physician does not know of a risk and should not have been aware of it in the exercise of ordinary care, he is under no obligation to make disclosure.

*Sard v. Hardy*, 281 Md. 432, 379 A.2d 1014, 1022–23 (1977); *Canterbury*, 464 F.2d at 788–79; *see generally* Alan Meisel, *The "Exceptions" to the Informed Consent Doctrine: Striking a Balance between Competing Values in Medical Decisionmaking*, 1979 Wis.L.Rev. 413. As noted by the courts which have examined this issue, the burden of going forward with evidence pertaining to a privilege rests on the physician in whose hands the necessary evidence ordinarily rests. *See Hondroulis*, 553 So.2d at 413; *Canterbury*, 464 F.2d at 791.

### C. *The Adequacy of Dr. Mallin's Disclosure*

After deciding which legal standard to apply, the issue becomes whether the information Dr. Mallin provided Korman satisfies this standard as a matter of law. Although Korman maintains that a patient would have "no inkling" that painful and unsightly scarring is a normal consequence of uncomplicated breast reduction surgery after reviewing the pamphlets, videos and consent forms provided by Dr. Mallin, we cannot agree. Dr. Mallin's office notes indicate he discussed scarring at both visits. Both the videos and pamphlets provided by Dr. Mallin emphasize that breast reduction surgery resulted in permanent scars. Finally the consent forms signed by Korman specifically refer to the risk of "unsightly and painful scarring." The trial court concluded that the information Dr. Mallin provided Korman clearly advised her of the scarring risk and therefore granted Dr. Mallin's motion for summary judgment.

██ Nonetheless, merely identifying a risk does not necessarily provide a patient with the information necessary for an informed decision.[5] For a trial court to decide on summary judgment that a doctor has disclosed sufficient information to allow a reasonable patient to make an informed decision about treatment, the record must establish that the physician explained to the patient in lay terms the nature and severity of the risk and the likelihood of its occurrence. *See Hondroulis*, 553 So.2d at 420.

██ After reviewing the record on appeal, we are unable to conclude that Dr. Mallin's explanation of the risks inherent in this procedure satisfied his duty of disclosure as a matter of law. In her affidavit, Korman states that she requested additional information about the scarring at the second consultation and that, in response, Dr. Mallin told her "not to worry" and that she would be happy with the results. A number of courts have held that a patient's request for more detailed information regarding a risk is a factor in determining whether there has been adequate disclo-

---

**5.** It is meaningless to tell a patient that a given risk is increased by 50% unless the patient is also told the original or baseline risk factor. For example, assuming the risk of unsightly scarring for nonsmokers is 2%, the risk for a smoker rises to 3%. However, if the risk factor for nonsmokers is 20%, the risk for a smoker rises to 30%, a very significant increase. A physician must not only disclose the identity of all known material risks, but also the likelihood of their occurrence in meaningful terms. *See Hondroulis*, 553 So.2d at 420.

sure. *See Distefano v. Bell*, 544 So.2d 567, 571 (La.App.1989) (holding that physician's duty of disclosure was "expanded" when patient requested physician to explain the "least likely" complications of proposed surgery), *writ denied*, 550 So.2d 650 (La. 1989); *see also Kinikin v. Heupel*, 305 N.W.2d 589, 595 (Minn.1981) (holding that where a doctor is aware or should be aware that a patient attaches particular significance to a risk, further disclosure may be required even under the professional community standard). Our own comments in *Pedersen* emphasize a physician's duty to respond *fully* to a patient's questions concerning treatment. 822 P.2d at 909.

Furthermore, although it is undisputed that Korman read that portion of the consent form which states that all risks of the procedure were increased by 50% because she smoked, this information has little meaning in the absence of a base probability figure establishing the average risk to an average patient. The record does not indicate that Dr. Mallin disclosed to Korman the probability that painful and unsightly scarring would occur in her case or explained the increased risk of such scarring attributable to smoking. *Cf. Barner v. Gorman*, 605 So.2d 805, 806 (Miss.1992) (where plaintiff, who underwent plastic surgery to minimize prominent neck scar, alleged that the surgeon had failed to disclose to her the risk of more severe scarring inherent in that procedure despite the fact that the risk of such recurrence was greater in a patient with her skin coloring); *see also Nisenholtz v. Mount Sinai Hosp.*, 126 Misc.2d 658, 483 N.Y.S.2d 568, 570 (N.Y.Sup.1984) (holding that physician has a duty to provide a "reasonable explanation" of potential risks and available alternatives under New York informed consent statute).

There is no question that an individual contemplating elective cosmetic surgery will attach particular significance to the risk of "unsightly and painful" scarring. Although Dr. Mallin certainly provided Korman with a significant amount of information concerning the proposed procedure and its attendant risks, we cannot say that he satisfied his duty of disclosure as a matter of law in light of the above circumstances. "Whenever nondisclosure of particular risk information is open to debate by reasonable-minded men, the issue is for the finder of facts." *Canterbury*, 464 F.2d at 788 (footnote omitted). We conclude that it is a factual question whether Dr. Mallin's explanation of the scarring risk was adequate to allow a reasonable patient to make an informed and intelligent decision whether to undergo the procedure.

## IV. *Conclusion*

We conclude that a physician must provide a patient with a reasonable explanation of the material risks of a proposed procedure so that the patient can make an informed decision concerning treatment. Taking the record in the light most favorable to Korman, we cannot conclude that Dr. Mallin discharged this duty as a matter of law. We therefore reverse the trial court's entry of summary judgment in favor of Dr. Mallin and remand for jury consideration of this issue.

REVERSED and REMANDED.

BURKE, J., not participating.