Frank HARROLD, Appellant,

v.

Robert R. ARTWOHL, M.D., Appellee.

No. S–11638.

Supreme Court of Alaska.

March 31, 2006.

---

**15.** Op. at 267.

**16.** *See id.* at 267–68.

**17.** *See id.* at 267.

Robert J. Jurasek, Pentlarge Law Group, Anchorage, for Appellant.

Howard A. Lazar and James J. Fayette, Delaney, Wiles, Hayes, Gerety, Ellis & Young, Inc., Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

After learning that he probably had appendicitis, Frank Harrold consented to immediate surgery to remove his appendix. The appendix turned out to be healthy. Harrold then sued his surgeon for failing to give him enough information to provide an informed consent, but the superior court dismissed the claim on summary judgment. The main question in this appeal is whether Harrold raised any genuine issues of material fact requiring a trial. Because evidence in the record suggests that Harrold may not have been told that a CT scan could have ruled out the need for immediate surgery, and because he reasonably could have believed that this information was important in deciding whether to give his consent, we hold that a triable issue of fact has been raised, protecting Harrold's claim against summary judgment.

## II. FACTS AND PROCEEDINGS

Frank Harrold came to the emergency room at Providence Hospital in Anchorage to get help for abdominal pain. He reported that he had been seen for kidney stones a month before; a CT scan performed then suggested that he had an appendicolith—a calcified mass in the appendix. The emergency room physician examined Harrold, suspected appendicitis, and summoned the on-call surgeon, Dr. Robert Artwohl.

Dr. Artwohl came to the emergency room, examined Harrold, and confirmed that Harrold probably did have appendicitis. The doctor discussed Harrold's symptoms with him, told him about the possibility of performing another CT scan, but advised Harrold that it would probably be best to simply remove the appendix immediately, since the appendix "would always be at issue" if Harrold had future similar episodes of abdominal pain.

Harrold agreed with the recommendation. After he finished speaking with Dr. Artwohl, he signed an informed consent form in the presence of registered nurse Vera Belic. Dr. Artwohl then operated and removed Harrold's appendix. During the surgery Dr.

Artwohl saw no signs of infection in or around Harrold's appendix; tests conducted after the operation confirmed that the appendix was normal. Harrold eventually sued Dr. Artwohl, claiming that the doctor had failed to provide Harrold enough information to allow him to give an informed consent. Harrold also claimed that Dr. Artwohl committed medical malpractice by performing unnecessary surgery.

The superior court dismissed the malpractice claim because Harrold failed to offer any expert evidence of medical malpractice to counter evidence offered by Dr. Artwohl.[1] Dr. Artwohl then moved for summary judgment on the informed consent claim, asserting that he had given Harrold enough information to make an intelligent treatment decision and that Harrold had given informed consent. In support of his motion, Dr. Artwohl submitted a copy of the informed consent form that Harrold had signed, as well as an affidavit by Nurse Belic, who had witnessed the signature, outlining the procedures she had followed to ensure that Harrold understood what he was signing.

Dr. Artwohl also submitted his own affidavit, transcripts of depositions that he and Harrold had recently given, and other relevant hospital records. The hospital records included the following entry from Dr. Artwohl's pre-operative report:

> The possibility of obtaining another CT scan was discussed, but in reality if this patient has more episodes of right lower quadrant pain, the appendix will always be at issue. So, we decided to proceed directly to appendectomy. I told the patient that he has approximately 15% chance that a normal appendix will be found. The technique of open versus laparoscopic was discussed and the patient states that he feels like he would like a laparoscopic approach because I told him that this usually involves a lot less incisional pain and he could go back to work a lot quicker.

Dr. Artwohl's affidavit echoed this account of his discussion with Harrold. The doctor re-

lied on these statements in moving for summary judgment, arguing that his evidence supported the conclusion that Harrold had received enough information to make an intelligent treatment choice.

Dr. Artwohl further maintained that Harrold had failed to offer any contrary evidence. In making this argument, the doctor pointed to Harrold's recent deposition testimony. During his deposition, Harrold testified that although he recalled discussing the need for an appendectomy with Dr. Artwohl, he did not remember discussing the possibility of getting another CT scan; nor did he recall being told that there was a fifteen percent chance that his appendix was healthy. Yet Harrold conceded the possibility that these matters might have been discussed and that he might simply have forgotten the discussion. Harrold also readily admitted that if he had indeed been told that there was an eighty-five percent chance that he had appendicitis, he would have agreed to the surgery.

Given these concessions, Dr. Artwohl insisted that Harrold's general inability to recall what had been discussed did not raise a genuine issue of fact reasonably tending to dispute the specific evidence describing what was actually discussed.

Harrold opposed Dr. Artwohl's motion for summary judgment, insisting that evidence in the record raised "multiple issues of fact" as to whether he had received enough information to make an informed treatment choice. Harrold pointed to an affidavit by his sister describing a post-surgical statement by Dr. Artwohl that, in Harrold's view, raised doubts about whether the doctor had reviewed Harrold's prior CT scan. He further argued that the implied consent form raised factual issues because it made no mention of the specific advice described in Dr. Artwohl's pre-operative report and because Harrold's signature on the form had been witnessed by Nurse Belic, instead of by Dr. Artwohl himself—an impermissible procedure according to Harrold.

---

1. Harrold does not challenge the superior court's order dismissing his malpractice claim, so we need not address that ruling.

Harrold's opposition also focused on a statement made by Dr. Artwohl in his deposition. During his testimony, the doctor acknowledged that if Harrold had been given a CT scan before having to decide if he wanted to proceed with the appendectomy, the scan could have established almost conclusively whether he actually did or did not have appendicitis: according to Dr. Artwohl, the additional test would have "ruled out or ruled in" appendicitis with "a high degree of accuracy ... 98 percent." In relevant part, Dr. Artwohl testified as follows:

Q And do you see anywhere on that consent form where it states that a[CT] scan can conclusively determine whether or not you have appendicitis?

A I would never tell a patient that a[CT] scan can conclusively demonstrate. I would tell a patient they can predict with a high degree of accuracy, but, no, it's not on there.

Q What would be a high degree of accuracy?

A 98 percent.

Q So it would have been 98 percent likely that if a[CT] scan was taken, it would have ruled out appendicitis?

A Ruled out or ruled in, yes.

This testimony prompted Harrold to submit a new affidavit, in which he asserted that nobody had ever told him that the scan could be so precise in detecting appendicitis; if he had known that the test could have ruled out the possibility of appendicitis, Harrold claimed, he "would have gladly taken that option."

2. Harrold initially failed to submit a timely opposition to Dr. Artwohl's motion for summary judgment, so the superior court entered an order granting the motion because it was unopposed. Harrold then moved for reconsideration and submitted a late opposition to the summary judgment motion, together with a motion to accept his late opposition. The superior court granted Harrold's motion to accept the late opposition but declined to reconsider its order granting summary judgment. Given these circumstances Dr. Artwohl acknowledges that the superior court considered Harrold's opposition in reaching its ultimate ruling and did not dismiss the informed consent claim merely because the claim was unopposed.

After considering the motion for summary judgment and the opposition, the superior court granted Dr. Artwohl's motion and dismissed Harrold's informed consent claim.[2]

## III. DISCUSSION

On appeal Harrold challenges the superior court's decision to dismiss his informed consent claim on summary judgment.[3] Harrold insists, as he did below, that the evidence concerning his informed consent claim raises triable issues of material fact that preclude deciding the claim on summary judgment. In response, Dr. Artwohl maintains that he is entitled to summary judgment because he presented undisputed evidence establishing that Harrold received all the information he needed to give an informed consent. In Dr. Artwohl's view, "Harrold's near-total failure of memory is insufficient to create a genuine issue of disputed fact."

 We independently review orders granting summary judgment, drawing all reasonable inferences in favor of the non-moving party.[4] We will affirm the trial court's order when the evidence establishes that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.[5] The party seeking summary judgment must make a "prima facie showing that he or she is entitled to judgment on the established facts as a matter of law...."[6] Once this showing has been made, "the opposing party must demonstrate that a genuine issue of fact exists to be litigated by showing that it can produce admissible evidence reasonably tending to dispute the movant's evidence."[7]

3. Harrold also appeals the superior court's order awarding Dr. Artwohl prevailing-party attorney's fees. Our decision on the merits of Harrold's claim makes it unnecessary to address this issue.

4. See Kaiser v. Umialik Ins., 108 P.3d 876, 879 (Alaska 2005); Sonneman v. State, 969 P.2d 632, 635 (Alaska 1998).

5. Sonneman, 969 P.2d at 635.

6. French v. Jadon, Inc., 911 P.2d 20, 23 (Alaska 1996) (citing Wassink v. Hawkins, 763 P.2d 971, 973 (Alaska 1988)).

7. Id.

■■ Here, we must apply these standards within the framework of our statutes and caselaw defining informed consent. We have previously recognized that "[t]he informed consent doctrine is based on the principle that every human being of adult years and sound mind has a right to determine what shall be done to his or her own body." [8] Alaska Statute 09.55.556 describes the basic duty to obtain informed consent by requiring that a health care provider "inform the patient of the common risks and reasonable alternatives to the proposed treatment or procedure." [9] We have emphasized that the scope of this duty must be viewed from the patient's perspective, not the doctor's; [10] in keeping with this view, we have construed the statute to "measure[ ] the physician's duty of disclosure by what a reasonable patient would need to know in order to make an informed and intelligent decision." [11] This perspective applies in determining all aspects of compliance with the duty, including determinations involving the existence and nature of a risk, the likelihood of its occurrence, and the probability that a reasonable patient would consider the information important when deciding on treatment.[12] We have also emphasized that determinations applying the reasonable patient standard must usually be left to the jury: "Whenever nondisclosure of particular risk information is open to debate by reasonable-minded [persons], the issue is for the finder of facts." [13]

■■ Harrold's strongest basis for claiming that he has raised a genuine dispute on the issue of informed consent under these standards centers on whether he received enough information about the possibility of having a CT scan before opting for surgery. As mentioned above, Dr. Artwohl explained in his deposition that a CT scan would have ruled in or ruled out the presence of appendicitis with a ninety-eight percent degree of certainty. In effect, then, viewing this testimony in the light most favorable to Harrold, the doctor acknowledged that a CT scan would have established to a near certainty whether Harrold actually needed immediate surgery. But Dr. Artwohl apparently may not have explained this to Harrold.

Dr. Artwohl stated in his affidavit that he discussed the possibility of another CT scan with Harrold, but recommended against choosing that option; he advised Harrold that there was "a 15% chance that a normal appendix would be found" if Harrold consented to immediate surgery. But the doctor "thought it would be best to proceed with appendectomy" because, "in the case of continuing pain, [Harrold's] appendix would always be an issue." Dr. Artwohl testified that Harrold then "decided to proceed with appendectomy."

8. *Parker v. Tomera*, 89 P.3d 761, 769 (Alaska 2004) (quoting *Korman v. Mallin*, 858 P.2d 1145, 1149 (Alaska 1993)).

9. AS 09.55.556(a). The statute also defines the necessary elements of a cause of action for failure to obtain informed consent and establishes several defenses:

(a) A health care provider is liable for failure to obtain the informed consent of a patient if the claimant establishes by a preponderance of the evidence that the provider has failed to inform the patient of the common risks and reasonable alternatives to the proposed treatment or procedure, and that but for that failure the claimant would not have consented to the proposed treatment or procedure.
(b) It is a defense to any action for medical malpractice based upon an alleged failure to obtain informed consent that
(1) the risk not disclosed is too commonly known or is too remote to require disclosure;
(2) the patient stated to the health care provider that the patient would undergo the treatment or procedure regardless of the risk involved or that the patient did not want to be informed of the matters to which the patient would be entitled to be informed;
(3) under the circumstances consent by or on behalf of the patient was not possible; or
(4) the health care provider after considering all of the attendant facts and circumstances used reasonable discretion as to the manner and extent that the alternatives or risks were disclosed to the patient because the health care provider reasonably believed that a full disclosure would have a substantially adverse effect on the patient's condition.

10. *Marsingill v. O'Malley*, 58 P.3d 495, 503 (Alaska 2002).

11. *Id.* (citing *Korman*, 858 P.2d at 1149).

12. *Id.* (citing *Korman*, 858 P.2d at 1149).

13. *Korman*, 858 P.2d at 1151 (citing *Canterbury v. Spence*, 464 F.2d 772, 788 (D.C.Cir.1972)).

When we read these statements in the light most favorable to Harrold, as we must in reviewing an order granting summary judgment, they suggest that Dr. Artwohl advised Harrold to forgo a CT scan and proceed directly to surgery despite a sizable chance that immediate surgery might not be needed. To be sure, Dr. Artwohl also told Harrold why the doctor thought Harrold might as well proceed with the appendectomy even though there was a fifteen percent chance that it might not be necessary. But Dr. Artwohl's accounts of his conversation with Harrold do not assert, or even suggest, that the doctor explained what a CT scan could have shown—that the test could have almost completely eliminated the existing uncertainty of Harrold's need for immediate surgery. And we find nothing in the record to suggest that it would have been unreasonable to give Harrold this information.

For his part, Harrold flatly asserts that he was never told how exact a CT scan could be. Although he testified at his deposition that his lack of memory prevented him from specifically denying that Dr. Artwohl's version of events might true, in opposing the summary judgment motion Harrold submitted an affidavit that is unequivocal on this point:

At no time did Dr. Artwohl or the nurse or anyone at the office state that another [CT] Scan would show to a 98% degree of reliability that I did or did not have appendicitis. It was my understanding from the discussions with Dr. Artwohl that I had to have the laparoscopic appendectomy. He did not tell me it could be prevented with a simple [CT] Scan which would show to a 98% degree of reliability that I in fact did not have appendicitis.

In response, Dr. Artwohl argues that Harrold's mere inability to recall what happened is too speculative a basis to sustain a genuine issue of fact that would reasonably tend to dispute the evidence on this point. But this argument focuses on the equivocal statements Harrold made in his deposition testimony. Harrold's statements in his later affidavit are neither speculative nor equivocal: based on personal knowledge, he professes to

be certain that nobody ever told him that a CT scan could confirm his condition to a ninety-eight percent level of certainty. Nor is this claim defeated by Harrold's earlier statements acknowledging an inability to recall exactly what Dr. Artwohl had said. The credibility of Harrold's claim cannot be considered at summary judgment: we must assume that his claim is true. And even if credibility could be considered, his claim would not necessarily conflict with his earlier testimony. Dr. Artwohl has never asserted that he told Harrold what a CT scan would do, so Harrold's current certainty on this point coincides with the doctor's account. It does not conflict with Harrold's earlier inability to contradict what Dr. Artwohl claims to have said.

In short, we conclude that Harrold's new affidavit raised a genuine factual dispute as to whether he was told that a CT scan could effectively rule out appendicitis, thus potentially offering a desirable alternative to immediate surgery. This dispute does not automatically qualify as a triable issue of fact. Because conflicting evidence precludes summary judgment only when the conflict involves material facts, we must ask separately if the issue disputed here is material. As we indicated above, compliance with the duty to obtain informed consent "must ultimately be judged by what a reasonable patient would want to know." [14] And when the question of what a reasonable patient would deem important is open to legitimate debate, it must ordinarily be decided at trial by the finder of facts.[15]

Here, we think that reasonable-minded jurors viewing the record in the light most favorable to Harrold could legitimately debate whether Dr. Artwohl told Harrold what a CT scan was capable of ascertaining: standing alone, the mere mention of "the possibility of obtaining another CT scan" might fail to convey any indication that this possibility would offer a significant increase in certainty. We similarly think that jurors could fairly debate whether a reasonable patient in Harrold's shoes would have wanted to hear this information before deciding on the appendectomy. As matters apparently

---

**14.** *Marsingill,* 58 P.3d at 504.

**15.** *Korman,* 858 P.2d at 1151.

stood without the information, Harrold knew that, by Dr. Artwohl's estimate, he faced an eighty-five percent chance of having appendicits and a fifteen percent chance of having a healthy appendix. Had information about the CT scan's accuracy been disclosed, Harrold would have gained the knowledge that further testing would either confirm to a near certainty that he needed immediate surgery or all but eliminate the chance that he had appendicitis. Given the obvious risk of refusing surgery in the face of an eighty-five percent chance of appendicitis, a fair-minded juror could find that a patient in Harrold's position might reasonably view this additional knowledge as crucial.

Because the dispute involves a genuine issue of fact, we hold that the superior court erred in granting summary judgment against Harrold.[16]

## IV. CONCLUSION

We REVERSE the superior court's judgment and REMAND the case for further proceedings.

EASTAUGH, Justice, not participating.

16. Harrold's remaining summary judgment arguments require only brief mention. We find no merit to Harrold's contention that the implied consent form obtained here was invalid because it was witnessed by Nurse Belic instead of being signed in Dr. Artwohl's presence. Neither AS 09.55.556 nor its implementing regulation, 7 AAC 12.120, can be reasonably read to require that the treating physician personally read the consent form to the patient or witness the patient's signature. Harrold misreads *Ward v. Lutheran Hospitals & Homes Society of America, Inc.*, 963 P.2d 1031, n. 12 (Alaska 1998), as providing support for his position. *Ward* simply recognizes that the duty to obtain informed consent extends only to a health care provider who proposes and directs the procedure at issue; it does not imply that a provider to whom this duty extends is the only person who can obtain the consent.

We similarly find no merit in Harrold's assertion that a genuine issue of material fact arises from the fact that his implied consent form fails to recite the specific information that Dr. Artwohl claims he discussed with Harrold. Neither the statute nor the regulation requires the form to recite the information communicated in obtaining informed consent.

Last, we reject Harrold's contention that his sister's affidavit raises a genuine factual dispute concerning Dr. Artwohl's awareness of Harrold's previous CT scan. The affidavit asserts that Dr. Artwohl asked Harrold's sister after the surgery whether Harrold had previously had his appendix x-rayed; but standing alone, the mere fact that Dr. Artwohl asked about previous x-rays does not support a reasonable inference that he must not have known about the recent CT scan.