**Richard K. OLSON, Appellant,**

v.

**TECK COMINCO ALASKA, INC., d/b/a Red Dog Operations, Appellee.**

**No. S–11755.**

Supreme Court of Alaska.

Sept. 29, 2006.

---

**24.** *Id.*

C.R. Kennelly, Law Office of C.R. Kennelly, Anchorage, for Appellant.

Sean Halloran, Hartig, Rhodes, Hoge & Lekisch, P.C., Anchorage, for Appellee.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

*OPINION*

BRYNER, Chief Justice.

## I. INTRODUCTION

Richard Olson was employed at the Red Dog mine. He frequently missed work without justification, so his employer, Teck Cominco Alaska, Inc., placed him on a step discipline plan. Olson continued to miss work, and Teck Cominco fired him for violating the plan. But shortly before Teck Cominco took this action, Olson had filed a workers' compensation claim alleging that he had been injured by exposure to lead on the job and needed to be treated for this condition. Teck Cominco's insurer had conducted an independent medical examination, which concluded that Olson did not have lead poisoning and required no treatment. After being fired, Olson sued Teck Cominco, alleging that it had wrongfully discharged him in retaliation for filing the workers' compensation claim. The superior court dismissed Olson's claim on summary judgment; Olson appeals. Because the evidence in the record fails to support an inference of retaliation and establishes that Teck Cominco justifiably fired Olson for absenteeism, we affirm.

## II. FACTS AND PROCEEDINGS

Richard Olson worked as a welder for Teck Cominco Alaska, Inc., at the Red Dog Mine near Kotzebue. His schedule called for him to work two weeks on at the mine and take one week off, when he could return home to Anchorage.

Olson had a long history of chronic depression and alcohol abuse; his condition was not work related but frequently caused him to miss work. On January 2, 2002, because of Olson's absences, Teck Cominco placed him on a step discipline program called the Performance Management Plan. This plan was

part of a standard program that Teck Cominco regularly used to enforce its absenteeism policies. The plan allowed Olson to take no more than five days of "unplanned absence[ ]" during 2002; each day of unplanned leave beyond the five-day limit would subject Olson to progressively increasing disciplinary steps, culminating in termination if he exceeded the limit by four days. The plan defined "unplanned absences" as any absence other than pre-approved paid time off and various types of specifically listed absences such as bereavement leave, workers' compensation leave, and Family Medical Leave Act (FMLA) leave.

By early July 2002 Olson had used two of his five unplanned absences. He had also used up all but ten of the eighty-four FMLA leave days that he was eligible to receive between October 2001 and September 2002. In addition, Olson had just taken fourteen days of workers' compensation leave for a work-related back injury, but his treating physician, Dr. Gary Polson, had cleared him to return to work on July 3.

On July 2, 2002, a naturopathic doctor in Anchorage, Torrey Smith, wrote a letter to Red Dog Mine reporting that he had diagnosed Olson as having an unusually high level of lead accumulation in his urine, a condition resulting in anemia and fatigue. Naturopath Smith said that he was referring Olson to Nurse Practitioner Bethany Buchanan, a chelation specialist in Anchorage. According to Naturopath Smith, Olson would receive two or three chelation treatments over the next three weeks but "should be able to return [to work] on his next work cycle."

The following day, Olson visited Nurse Buchanan, who examined him and prepared a report confirming Naturopath Smith's diagnosis of lead toxicity. Nurse Buchanan recommended that Olson receive about thirty chelations over a period of several months; but in keeping with Naturopath Smith's view, Nurse Buchanan also made it clear that these treatments would not prevent Olson from returning to his job: "I plan to have him get chelation while he's off work, 1–3 IVs per week, and he'll continue this until he has received about 30 chelations."

When Nurse Buchanan wrote this letter, Olson had just been released back to work by the physician who had been treating his back injury, Dr. Polson. Olson's work schedule called for him to work a two-week shift at Red Dog beginning July 4. But Olson took his next ten days, July 4–13, as FMLA leave. Meanwhile, Olson had sent Teck Cominco's human resources director, Steven Lindberg, copies of letters written by Naturopath Smith and Nurse Buchanan. As already mentioned, both letters indicated that Olson could be treated during his regular time off in Anchorage and would not need to miss regularly scheduled work.

On July 12, Lindberg telephoned Olson to remind him that his remaining FMLA leave would be used up if he missed work again on July 13, and to warn him that if he continued to miss work through July 17—the end of Olson's scheduled shift—he would accumulate four new unexcused absences, which would put him in the first disciplinary step of his plan. In response, Olson told Lindberg that he was being treated for metal toxicity and asked Lindberg to contact Nurse Buchanan for details. Lindberg called Nurse Buchanan later that day (July 12); she confirmed that she was giving Olson chelation treatments for metal toxicity, but according to Lindberg, she also "was very clear in telling me that Mr. Olson did not have to miss any work to receive his treatments."

Lindberg called Olson back the following day, July 13, to make sure Olson understood Nurse Buchanan's position that Olson did not need to miss work. Olson responded that he nonetheless planned to file a workers' compensation claim as a result of his lead poisoning and wanted to stay in Anchorage for his treatments. Accordingly, Olson asked Lindberg to credit all future absences as workers' compensation leave. Lindberg then advised Olson "not to put all of his eggs in a basket," warning that if Olson's condition turned out not to be covered by workers' compensation, Olson would "end up out of planned days on his attendance control plan." Olson replied that he understood, and appreciated Lindberg's candor.

Olson continued to miss work from July 14 through July 17, the last four days of his shift. Teck Cominco counted these days as unplanned absences because July 13 had been Olson's last available day of FMLA leave. The absences on July 14, 15, and 16 used up the three remaining days of the five unplanned absences allotted to Olson under his performance management plan; so Teck Cominco counted July 17 as his first unplanned absence exceeding the five-day limit, thus placing him on step 1 of the discipline program.

Olson's next work shift was scheduled to run from July 25 through August 7. He worked at the mine as scheduled, and then took his regular break. Olson's next scheduled shift began on August 18. He failed to report for work that day and also missed the following two days, August 19 and 20. These three unplanned absences caused Olson to progress from step 1 to step 4 of his discipline plan, which provided for termination. After Olson failed to report to work on August 20, Teck Cominco immediately suspended him pending review for termination as of August 21.

Meanwhile, because Olson had told Lindberg that he would seek workers' compensation for his exposure to lead, Teck Cominco's insurer had made arrangements for an independent medical examination of Olson by a medical toxicology specialist, Dr. Brent Burton. On August 14, 2002, Dr. Burton reported that his examination revealed no evidence of lead toxicity and no need to treat that condition: "In summary," the report concluded, "Mr. Olson is a welder who experienced a modest exposure to lead during the course of his work. He does not have any evidence of illness related to lead intoxication. The treatment[s] presently provided by his naturopath and nurse practitioner are inappropriate and ineffective and not warranted for Mr. Olson's condition."

Based on Dr. Burton's report, Teck Cominco's insurer determined that it would controvert Olson's workers' compensation claim; it notified Teck Cominco of this decision in mid-September and sent Lindberg a copy of Dr. Burton's report, which Lindberg received on September 16, 2002. Because, in Lind-berg's view, "[n]othing in Dr. Burton's report suggested ... that there was any reason for Mr. Olson to have been absent from work," Lindberg immediately forwarded the information to Teck Cominco's general manager, Robert Jacko, who made the decision to terminate Olson in accordance with Olson's performance management plan.

That same day, September 16, Lindberg sent Olson a letter notifying him that he had been terminated, effective August 21, 2002, for violating his plan. Lindberg's letter explained that this decision was supported by Dr. Burton's report:

In our conversation on Saturday, July 13, 2002, you requested an application for Workers' Compensation coverage for all absences from July 14 forward. If substantiated, the Workers' Compensation claim would have had the effect of converting your unplanned absences to planned absences and eliminating the attendant penalties. As of today however, Teck Cominco was notified by Eagle Insurance that the Workers' Compensation claim was being terminated. This action was based on the examining physician for the Workers' Compensation claim determining that you do not have a bona fide work related injury. Therefore, the absences associated with the Workers' Compensation claim are deemed to be unplanned pursuant to the terms of your Performance Management Plan.

You were aware of the applicability of your Performance Management Plan to your work with Teck Cominco and you expressed an understanding of the mechanics of your Performance Management Plan, not only when it was initiated but also in our phone conversation of Saturday, July 13, 2002, when we discussed the specific dates on which your unplanned absences would result in Step Discipline and termination. While regrettable, this termination was anticipated by you if a work related injury was not substantiated.

After receiving the termination letter, Olson sued Teck Cominco for wrongful discharge, alleging that the company had improperly fired him in retaliation for asserting a workers' compensation claim. Teck Comin-

co moved for summary judgment, insisting that it terminated Olson for missing work in violation of his performance management plan, not as retaliation for his workers' compensation claim. In support of its motion, Teck Cominco submitted affidavits from Lindberg and Jacko, copies of relevant business and medical records, and evidence that Teck Cominco obtained through discovery from Olson, including a transcript of Olson's deposition.

Lindberg's affidavit summarized Olson's history of poor attendance, and explained Teck Cominco's step discipline program and the details of Olson's performance management plan. It also summarized Lindberg's various discussions with Olson, Nurse Buchanan, and Naturopath Smith. The affidavit unequivocally denied Olson's charge of retaliation, emphasizing that Olson had been fired only for unexcused absenteeism, not for filing a claim, and that he was fired on this ground only after all relevant treatment providers—Dr. Burton, Nurse Buchanan, and Naturopath Smith—had confirmed that Olson's "alleged lead poisoning did not require him to miss any work beyond the absences allowed him under his Performance Management Plan." In addition to his affidavit, Lindberg submitted contemporaneous notes documenting his discussions with Olson, Naturopath Smith, and Nurse Buchanan.

Jacko's affidavit supported Lindberg's. Jacko disclaimed any intent to retaliate against Olson for filing a claim, averring that Teck Cominco's step discipline program had been "consistently and systematically applied to enforce absenteeism policies. Without any exception[.]" He emphasized that he had terminated Olson "based solely upon the fact that Mr. Olson had been absent from work for an excessive number of days." Jacko also pointed out that he made the decision to fire Olson only after determining that Dr. Burton had found no work-related injury and

that "Mr. Olson's Naturopath, Torrey Smith, and Mr. Olson's Nurse Practitioner, Bethany Buchanan, had each confirmed that Mr. Olson was not required to miss any work as a result of the medical condition that they were treating."

Olson opposed Teck Cominco's summary judgment motion but submitted no evidence to support his opposition. In reply to the opposition, Teck Cominco argued that the undisputed facts established that Olson was terminated solely for absences unrelated to any alleged injury.

The superior court granted Teck Cominco's motion for summary judgment, finding Teck Cominco's reply to be dispositive.

Olson appeals.

## III. STANDARD OF REVIEW

■■■ A party moving for summary judgment must offer sufficient admissible evidence to make a prima facie showing that the party is entitled to judgment as a matter of law based on the established facts.[1] To defeat summary judgment, the opposing party must then offer admissible evidence reasonably tending to dispute the moving party's evidence, thus establishing that a genuine issue of material fact remains to be tried.[2] We independently review orders granting summary judgment,[3] considering the entire record in the light most favorable to the non-moving party[4] to determine whether it reveals any genuine issues of material fact.[5]

## IV. DISCUSSION

■■ On appeal, Olson challenges the superior court's order granting summary judgment, insisting that the evidence raises genuine issues of material fact concerning his retaliatory discharge claim. Olson contends that he was fired for filing a workers' compensation claim because Teck Cominco decided that his claim lacked merit. To support

1. *Harrold v. Artwohl,* 132 P.3d 276, 279 (Alaska 2006) (citing *French v. Jadon, Inc.,* 911 P.2d 20, 23 (Alaska 1996)).

2. *Id.* (citing *French,* 911 P.2d at 23).

3. *Tongass Sport Fishing Ass'n v. State,* 866 P.2d 1314, 1317 n. 7 (Alaska 1994).

4. *R.E. v. State,* 878 P.2d 1341, 1345 (Alaska 1994).

5. *French,* 911 P.2d at 24 (citing *Broderick v. King's Way Assembly of God Church,* 808 P.2d 1211, 1215 (Alaska 1991)).

this contention, Olson points to Teck Cominco's admitted reliance on its insurer's decision to reject Olson's benefits claim in light of Dr. Burton's medical report, which in turn found no merit to Olson's claim. Olson insists that only the Workers' Compensation Board has authority to decide the validity of a worker's claim—an employer like Teck Cominco cannot make that decision. Because Alaska law protects workers' rights to have the board rule on their claims, Olson reasons, Teck Cominco's conduct violated public policy and amounted to a prohibited discharge in retaliation for exercising his rights.[6]

Teck Cominco counters that the undisputed evidence it presented in support of its motion for summary judgment shows that Olson was properly fired because of unexcused absences and that his absenteeism had nothing to do with his workers' compensation claim. Our review of the record persuades us that Teck Cominco's argument has merit. In our view, even when the record is construed in the light most favorable to Olson, uncontroverted evidence establishes that Olson was fired for his continuing unexcused absences from work, not for filing a non-meritorious claim.

Undisputed evidence shows that Olson amassed "an extraordinary number of absences from work" well before he first mentioned his workers' compensation claim to Lindberg on July 13, 2002. According to Lindberg, "by 2001, Mr. Olson had earned the distinction of having the worst attendance record of any Teck Cominco employee in the history of the Red Dog Mine." Because of this absenteeism Teck Cominco had placed Olson on a step discipline program by the beginning of 2002, a program that strictly limited his unplanned absences and promised to lead quickly to termination if Olson ex-

ceeded the limit by as few as four days. Teck Cominco had systematically and consistently used this program to control absenteeism at Red Dog, and had enforced its provisions without exception.

By July 11, 2002, barely halfway through the year, Olson had used up nearly all his available leave besides three remaining days of the limited unplanned absences allotted under his discipline plan. He had been absent from work for a substantial time and gave no indication that he planned to return. Lindberg called to make sure that Olson understood that if he continued to miss work, he would soon expose himself to the disciplinary steps of his plan. In response, Olson mentioned his recent diagnosis for lead toxicity and his plans to be treated for the condition. Yet when Lindberg checked with the two treatment providers who had recommended and were administering this treatment—Naturopath Smith and Nurse Buchanan—Lindberg learned that neither saw any need for Olson to miss his regularly scheduled work on account of the treatments.

On July 13, the last day of Olson's FMLA leave and the day before he would begin to accrue additional unplanned absences, he informed Lindberg for the first time that he considered his lead toxicity to be work related, planned to file a workers' compensation claim, and wanted all future absences to be counted as workers' compensation leave. When cautioned that his request would be denied unless the need for further absences could be confirmed, Olson said that he understood.

By July 16, Olson had used up his allotment of unplanned absences; when he missed work the next day he was placed on the first step of the discipline plan—just three absences away from step 4: immediate

---

**6.** Olson rests this retaliatory discharge theory primarily on our recent decision in *Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427 (Alaska 2004) (recognizing potential claim for retaliatory discharge based on evidence suggesting that employer's reasons for termination violated public policy). He also cites two New York workers' compensation cases for the proposition that an employer may not take adverse action against an employee based on a unilateral determination that the employee's workers' compensation claim

is non-meritorious: *Tomlin v. Asplundh Tree Expert Co.*, 229 A.D.2d 740, 645 N.Y.S.2d 612 (N.Y.App.Div.1996); and *De La Concha v. Fordham Univ.*, 292 A.D.2d 662, 738 N.Y.S.2d 745 (N.Y.App.Div.2002). Because we conclude that the evidence fails to support Olson's contention that Teck Cominco fired him for filing a non-meritorious claim, we need not consider the validity of Olson's retaliatory discharge theory and express no opinion on the theory.

termination. When Olson reached step 4 by missing work on August 20, Teck Cominco suspended him pending final review for termination, as his plan required it to do.

While these events unfolded, Dr. Burton completed his independent medical examination of Olson and reported that his examination revealed no signs of lead toxicity requiring any treatment. In mid-September, upon receiving the report, Teck Cominco's insurer decided to controvert Olson's compensation claim. Teck Cominco learned of this decision and reviewed Dr. Burton's report on September 16. The company then terminated Olson and notified him that it had taken this action under the terms of his step discipline plan because his independent medical examination determined that he "d[id] not have a bona fide work related injury."

In our view, the undisputed evidence describing these events cannot support a reasonable inference of retaliation. In summary, the record shows:

- More than eight months before it ultimately fired Olson, his chronic absenteeism had led Teck Cominco to place him on a well-defined and strictly enforced company program of progressive discipline that severely limited his unplanned absences and promised termination if Olson exceeded the plan's limit of absences by just four days.

- Before Olson first mentioned that he wanted to file a workers' compensation claim for his recently diagnosed condition of lead toxicity, Olson was on the threshold of violating his plan and was about to be subjected to the first step of discipline.

- Nearly a month before Teck Cominco formally notified Olson of his termination, he had reached the last step of progressive discipline mandated by his plan—termination—and Teck Cominco had immediately suspended him pending final review for termination.

- When Teck Cominco ultimately did notify Olson of his termination after receiving Dr. Burton's report, it explained that, based on the independent medical examination's finding, he was being terminated for violating the terms of his plan.

To be sure, Teck Cominco's termination letter tied the company's action to Dr. Burton's report, which found that Olson's claim was meritless. Yet the letter also made it clear that Olson was being fired because Dr. Burton's report confirmed that Olson had violated the terms of his plan.[7] Olson equates this to firing him for filing a claim that the company believed had no merit. He reasons that allowing Teck Cominco to make such a decision would preclude him from exercising his right to have the workers' compensation board decide whether he needed to be treated for work-related exposure to lead.

We disagree. In considering whether the termination letter supports Olson's theory of retaliation, we must recall that, by his own account, Olson based his workers' compensation claim on advice he received from Naturopath Smith and Nurse Practitioner Buchanan, who had diagnosed him with lead toxicity and recommended a course of chelation treatments. Dr. Burton's report categorically rejected this diagnosis and dismissed the proposed treatments as "quackery." This conclusion undeniably raised a genuine dispute as to whether Olson suffered from the work-related condition he alleged and whether he needed chelation treatments for that condition.

Yet Teck Cominco's decision to fire Olson for missing work did not hinge on the resolution of this dispute. Even though both Naturopath Smith and Nurse Buchanan believed that Olson suffered from a work-related condition and needed chelation treatments, neither believed that he needed to miss work for these treatments. To the contrary, uncontroverted record evidence shows that they both informed Lindberg that Olson could keep working on his normal schedule while he was being treated. So when Dr. Burton found no work-related condition requiring

**7.** As Teck Cominco's letter put it, Olson's termination "was based on the examining physician for the Workers' Compensation claim determining that you do not have a bona fide work related injury. *Therefore, the absences associated with the Workers' Compensation are deemed to be unplanned pursuant to the terms of your Performance Management Plan.*" (Emphasis added.)

treatment, his report simply confirmed what Olson's own treatment providers had expressed on this point; in other words, despite their differing views regarding Olson's condition and his need for chelation treatments, none of the treatment providers believed that he needed to miss work.

Lindberg specifically addressed this point in his affidavit, emphasizing that Olson would not have been disciplined "if I had learned that a workers['] compensation injury *warranting an absence from work* had occurred." (Emphasis added.) Lindberg went on to give a detailed account of the efforts he made to determine if any conceivable basis existed that might have allowed Olson to claim a work-related justification for failing to show up for work:

> I was careful to find out whether there were any facts that would suggest that Mr. Olson's absence from work resulted from either a real or an imagined work related injury. I had obtained confirmation from Nurse Buchanan (oral and written) and from Naturopath Smith (written) that Mr. Olson's alleged lead poisoning did not require him to miss any work beyond the absences allowed him under his Performance Management Plan. I did not rely on Mr. Olson's representation that his workers['] compensation claim was based only upon his assertion of lead poisoning, but obtained confirmation from the Claims Examiner charged with making a determination in Mr. Olson's case that there was no claimed injury other than lead poisoning that might cause him to miss work, and I obtained further confirmation that there was no assertion contrary to the representations made by his nurse practitioner to the effect that Mr. Olson's treatment did not require him to miss work.

Olson offered no evidence below to challenge Lindberg's account. And Olson never alleged, or even suggested, that he actually needed to miss work in order to receive the treatment he sought for exposure to lead. To the contrary, Olson freely acknowledged in his deposition that he recalled Nurse Buchanan telling him that he would not need to miss work. He also conceded that apart from some absences caused by his back injury (which Teck Cominco had treated as workers' compensation leave), all of his "other absences were related to the severe depression that [he] was dealing with." And when asked, "Did your depression have anything to do with Teck Cominco," Olson expressly admitted, "I don't believe it did." [8]

In short, the record reveals no dispute as to any genuine issue of material fact concerning Teck Cominco's reason for firing Olson. Uncontroverted evidence establishes that Olson was terminated for violating the terms of his disciplinary plan because Teck Cominco's review of his situation confirmed that, regardless of the divergent opinions concerning Olson's condition and need for treatment, no one with relevant knowledge of his claim— including Olson's own treatment providers and Olson himself—saw any reason for Olson to miss work for the treatment he allegedly needed.

Although we have previously recognized that "[c]ausation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge," [9] we have never suggested that this rule must be mechanically applied in all situations. Under the unique circumstances presented here, we conclude that neither the proximity in time between Dr. Burton's report and Teck Cominco's letter of termination nor the letter's reliance on Dr. Burton's report can support a reasonable inference that the letter was motivated by a decision to retaliate against Olson for filing a meritless claim. We thus conclude that the superior court properly granted the motion

---

**8.** In his reply brief on appeal, Olson suggests that his depression *was* work related and might have been caused by his exposure to lead, and he cites various authorities for the proposition that depression can be a symptom of lead poisoning. But Olson failed to make this argument in the superior court, presented no evidence there to support it, and belatedly raised the issue on appeal in his reply brief. For all these reasons, the point has not been properly preserved.

**9.** *VECO, Inc. v. Rosebrock,* 970 P.2d 906, 919 (Alaska 1999); *see also Kinzel,* 93 P.3d at 433.

 
for summary judgment.[10]

## V. CONCLUSION

For these reasons we AFFIRM the superior court's judgment.

---

**10.** Our decision on this ground makes it unnecessary to consider the alternative grounds Teck Cominco advances for affirming the superior court's decision.