[Cite as *Shepherd v. Ohio State Univ. Podiatry*, 2012-Ohio-6322.]



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

MYRA SHEPHERD

    Plaintiff

    v.

OHIO STATE UNIVERSITY PODIATRY, et al.

    Defendants

Case No. 2009-09639

Judge Joseph T. Clark

<u>DECISION</u>

{¶ 1} Plaintiff brought this action alleging medical negligence. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.[1]

{¶ 2} At the trial of this matter, plaintiff testified that she is a 59 year old woman who has lived alone since June 2010 when her husband had a stroke and was moved to a senior care facility. Plaintiff acknowledged that she has been a long time smoker and that she had previously suffered a heart attack. She has also been diagnosed with rheumatoid arthritis. She related that since 2001, she had had difficulty with walking due to the pain in her lower legs and feet. The pain was so bad, in fact, that plaintiff was forced to take a disability retirement.

{¶ 3} In 2001 or 2002, plaintiff's physician, Patrick Ball, D.O., referred her to Madhu Mehta, M.D., for treatment of her arthritic left knee. Plaintiff had also complained of a swelling in her lower extremities combined with alternative burning and freezing pain. She was referred to a Dr. Coats who diagnosed neuropathy.

{¶ 4} Plaintiff continued to have issues with pain and swelling in her feet and legs and her lower legs began turning a shade of purple. Dr. Mehta told plaintiff she needed to see another physician for further treatment.

{¶ 5} Alan Block, D.P.M., M.S., testified that plaintiff was referred to him by her rheumatologist, Dr. Mehta. On July 12, 2007, the date of plaintiff's first office visit, Dr. Block knew that plaintiff had arthritis, but he did not know the type. He also knew that plaintiff had estimated the level of pain in her lower left extremity at "ten out of ten" over the last four years.

{¶ 6} Upon examination, Dr. Block noted that plaintiff had a non-palpable posterior tibial pulse and that her bilateral capillary filling time was five seconds. He observed severe edema and he noted a lack of sensation in plaintiff's left heel accompanied by a burning pain. Plaintiff's x-rays revealed an ulcer on plaintiff's heel and a thickening of the skin.

{¶ 7} Dr. Block diagnosed avascular necrosis of the talus and destruction of the tibiotalar joint, with a possible destruction of the subtalar joint. He recommended that plaintiff undergo a surgical procedure known as a tibiotalocalcaneal arthrodesis. In layman's terms, Dr. Block believed that the joint between plaintiff's ankle and heel had perished due to an interruption in the blood supply, and he intended to surgically fuse plaintiff's ankle bone to her heel bone with the aid of metal nails, screws and other hardware.

{¶ 8} Plaintiff testified that Dr. Block offered her no other option for treatment. Plaintiff's sister, Lovel Clay, who attended all of plaintiff's appointments, did not recall Dr. Block advising plaintiff of any other treatment options. She did remember, however, that Dr. Block told plaintiff that he would not agree to perform surgery unless she agreed to quit smoking. Clay testified that she persuaded her sister to have surgery because Dr. Block had convinced her that it would benefit her sister. Plaintiff signed a consent form and Dr. Block's admission notes state that he informed plaintiff of the risks associated with the surgery and of the non-surgical treatment options available to her. (Joint Exhibit 11.) Although plaintiff acknowledged that she can "get confused sometimes," she insisted that she was never made aware of other treatment options.

---

[1]Defendants' January 23, 2012 motion for leave to file a brief in excess of the court's prescribed page limitation is GRANTED instanter.

{¶ 9} The surgery was performed in August 2007 and thereafter, Dr. Block undertook a course of post-operative care which consisted of checking for signs of infection, local wound care, and debridement. Plaintiff presented to Dr. Block's office for such care on 14 or 15 occasions, at which time she was seen by either Dr. Block or one of two other OSU resident physicians, Drs. Jeremiah Bushmaker and Adam Thomas. Although Dr. Block's notes indicate that plaintiff was doing well post-operatively, plaintiff testified that she was in terrible pain and that her wound was swollen, hot to the touch and draining. Plaintiff denies slipping in the shower and "banging" her left foot as stated in the notes, but her sister did remember this event and that it caused trauma to the left foot. Plaintiff also continued to smoke.

{¶ 10} As a result of plaintiff's office visit on June 5, 2008, plaintiff underwent a CT scan which showed a fragmentation and collapse of both the talus and a segment of plaintiff's distal tibia. In layman's terms, the CT scan showed that the surgical hardware had failed and that plaintiff's talus had been crushed between her tibia and heel. Dr. Thomas subsequently suspected an infection and he ordered a bone culture following the July 9, 2008 appointment. The culture confirmed the presence of Methcillin Resistent Staphylococcus Aurus bacteria (MRSA). Plaintiff was referred to another physician by the name of Dr. Scott Van Aman, who performed a below the left knee amputation.

{¶ 11} "In general, when a medical claim questions the professional skill and judgment of a physician, expert testimony is required to prove the relevant standard of conduct." *White v. Leimbach*, 131 Ohio St.3d 21, 2011-Ohio-6238, ¶ 38; citing *Berdyck v. Shinde*, 66 Ohio St.3d 573, 579 (1993); *Bruni v. Tatsumi*, 46 Ohio St.2d 127, 130 (1976).

{¶ 12} Plaintiff alleges that Dr. Block breached the standard of care in his treatment of her left lower extremity when he misdiagnosed her condition, performed unwarranted surgery, and thereafter failed to diagnose and treat her post-operative infection. In support of her claims, plaintiff called Steven R. Graboff, M.D., as her expert witness.

{¶ 13} Dr. Graboff is a board certified orthopedic surgeon who is licensed to practice medicine in California. He no longer performs surgery but he continues to see patients five days per week in a nonsurgical orthopedic practice along with his forensic work and some teaching. Dr. Graboff testified that he had performed the same surgical

procedure performed on plaintiff, commonly known as an ankle fusion, approximately 30 to 40 times in his career. Dr. Graboff stated that it was common practice for an orthopedic surgeon to collaborate with a podiatrist in performing surgical procedures, such as the one performed by Dr. Block, and that he is familiar with the standard of care applicable to podiatrists in the performance of ankle fusion surgery. According to Dr. Graboff, in the context of the ankle fusion surgery performed in this case, the same standard of care applies whether the medical practitioner is an orthopedic surgeon or podiatrist.

{¶ 14} After conducting his review of plaintiff's medical records and the deposition testimony of plaintiff and Drs. Block, Thomas, and Bushmaker, Dr. Graboff opined that plaintiff suffered from a condition known as neuropathic arthropathy when she first presented to Dr. Block and not avascular necrosis as was diagnosed. According to Dr. Graboff, neuropathic arthropathy is the death of nerves leading to the lower leg, ankle and foot secondary to diminished bloodflow whereas avascular necrosis is bone death secondary to a loss of blood flow to the joint itself. Neuropathic arthropathy results in the loss of sensation in the ankle joint and this loss of feedback leads to microtrauma, arthritis, fracturing and the destruction of the ankle joint. In patients with diabetes, the condition is known as Charcot joint.

{¶ 15} In Dr. Graboff's opinion, plaintiff's complaints of a burning pain in her foot, the loss of external sensation, edema and a capillary filling time of five seconds are classic signs of a peripheral vascular disease, such as neuropathic arthropathy. In fact, when Dr. Graboff saw the fragmenting of both the talus and the end of the tibia which was visible in x-rays taken July 5, 2007, he was convinced that neuropathic arthropathy was the correct diagnosis. He testified that "it's not even close to being avascular necrosis."

{¶ 16} Dr. Graboff was also of the opinion that Dr. Block should have made a greater effort to learn plaintiff's relevant prior medical history before suggesting surgery. More particularly, Dr. Graboff asserted that Dr. Block should have obtained plaintiff's medical records and then contacted both Dr. Ball and Dr. Mehta regarding plaintiff's prior care and treatment. According to Dr. Graboff, Dr. Block breached the standard of care when he relied almost exclusively upon the recollection of plaintiff's sister, Lovell Clay, as his source of information about plaintiff's prior medical history.

{¶ 17} Indeed, given plaintiff's medical history, Dr. Graboff opined that it was "negligent to even offer this patient the operation." He based his opinion on his belief that plaintiff had preexisting osteomyelitis in her lower left extremity, plaintiff's medical records which showed a chronic ulcer on plaintiff's left heel, improper healing in her neuropathic ankle joint and the fact that the steel rod and other hardware necessary for the operation were to be placed in an area of plaintiff's heel that had been the site of a chronic ulcer. Given these factors, Dr. Graboff estimated the chances of non-union of the ankle and heel at 85 percent. Even if plaintiff did not have a pre-existing osteomyelitis, Dr. Graboff considered the operation "too risky."

{¶ 18} Although Dr. Graboff was critical of both Dr. Block's diagnosis of plaintiff's condition and his hasty decision to perform surgery without first obtaining a relevant medical history, Dr. Graboff did not criticize the manner in which the surgical procedure was performed. Dr. Graboff was, however, extremely critical of the post-operative care rendered by Dr. Block.

{¶ 19} In Dr. Graboff's opinion, plaintiff developed osteomyelitis, a bacterial infection of the bone, in September 2007, while she was under Dr. Block's post-operative care. More particularly, Dr. Graboff believed that the surgery performed by Dr. Block in August 2007, "reactivated" osteomyelitis, which was first detected by Dr. Ball in 2001, later observed in a culture taken in 2006, and then "spread" the infection to her ankle joint.

{¶ 20} Plaintiff had surgery on August 3, 2007, and it was the opinion of Dr. Graboff that plaintiff's incision should have been healed within two weeks of that date. Dr. Graboff attributed the failure of timely healing both to the traumatic event to plaintiff's heel she reported shortly after surgery and the presence of infection. As a result of these factors, plaintiff's wound dehisced (split) in September and became a non-healing ulcer according to Dr. Graboff. Dr. Graboff testified that even though plaintiff's wound eventually closed near the end of September 2007, he believed the infection was still festering under plaintiff's skin.

{¶ 21} According to Dr. Graboff, an x-ray is a very poor method of detecting an infection such as the one in plaintiff's left lower extremity; that certain blood tests, an MRI, CT scan or bone scan are the preferred methods of detection. In his opinion, had osteomyelitis been detected and treatment begun in September 2007, plaintiff would not have lost her leg to amputation.

{¶ 22} Dr. Graboff did not believe plaintiff's smoking alone caused the fragmentation and destruction of plaintiff's ankle bone. Although Dr. Graboff acknowledged that smoking can cause a non-union, he believed that the non-union of plaintiff's ankle and heel was caused by the infection which destroyed the bones in plaintiff's lower left extremity.

{¶ 23} Dr. Graboff testified that the appropriate standard of care for patients with neuropathic arthropathy is to treat the condition conservatively with rest and immobilization either by casting or splinting for a period of at least six weeks. In his opinion, Dr. Block breached the standard of care by misdiagnosing plaintiff's condition, suggesting a surgical option with an unreasonably high risk of failure, and thereafter failing to timely diagnose and treat plaintiff's post-operative infection.

{¶ 24} Defendants presented the testimony of Dr. Patrick Deheer, DPM, by way of deposition. Dr. Deheer offered his expert opinions on the initial diagnosis of plaintiff's condition, the decision to perform surgery, and plaintiff's post-operative treatment.

{¶ 25} Dr. Deheer is licensed to practice podiatric medicine in Indiana and he was board certified in reconstructive foot and ankle surgery both in 1993, and then again in 1998, at an elevated level. He spends roughly 30 percent of his time performing foot and ankle surgery and another 25 percent performing wound care. His work as a witness or consultant on legal cases has been limited to approximately ten cases in the last ten years, with 80 percent of such work on behalf of the physician/defendant. Dr. Deheer testified that he is acquainted with Dr. Block via the lecture circuit.

{¶ 26} Dr. Deheer testified that he is familiar with the standard of care required of a podiatrist when treating a patient with avascular necrosis, but he stated that the condition is not common and that he sees such patients only once or twice per year. With regard to the diagnosis of plaintiff's left foot, Dr. Deheer agreed with Dr. Block's assessment of avascular necrosis. He disagreed with Dr. Graboff's diagnosis of neuropathic arthropathy, primarily because that condition is seen almost exclusively in diabetic patients and those with other rare diseases such as leprosy and syphilis. Dr. Deheer also noted that Charcot typically affects the mid-foot rather than the ankle. He did acknowledge that at their most advanced stages avascular necrosis and neuropathic arthropathy are virtually indistinguishable inasmuch as both conditions result in the total destruction of the ankle bone. Dr. Deheer stated that at earlier stages, the two conditions can be distinguished inasmuch as x-rays of an ankle joint will show

white in patients with avascular necrosis whereas neuropathic arthropathy is characterized by swelling.

{¶ 27} Dr. Deheer "completely disagrees" with Dr. Graboff's opinion that surgery should not have been considered as a treatment option for plaintiff. He stated that it was a "very acceptable treatment" for plaintiff's condition, the "gold standard." He further asserted that avascular necrosis can lead to a reverse arch of the foot, a condition which can only be remedied surgically.

{¶ 28} With respect to the wound dehiscence that occurred in September of 2007, Dr. Deheer opined that plaintiff's smoking and her failure to stay off the foot in violation of doctor's orders was the probable cause. The fact that plaintiff experienced wound dehiscence did not, in Dr. Deheer's opinion, mean that plaintiff's wound was infected. According to Dr. Deheer, if plaintiff's foot had shown signs of infection in September of 2007, he would have expected to see erythema and/or purulent drainage noted in the record of her visit. He saw no signs of infection noted in plaintiff's post-operative records prior to the dehiscence and his review of plaintiff's deposition revealed that plaintiff made no complaints consistent with the presence of infection prior to that time.

{¶ 29} Dr. Deheer opined that Dr. Block treated plaintiff's dehiscence within the standard of care and that the subsequent non-union in 2008 was not caused by poor post-operative care but by plaintiff's continued smoking and non-compliance with Dr. Block's orders.

{¶ 30} Defendants also presented the testimony of Bruce Farber, M.D., as their expert in the field of infectious disease. Dr. Farber is licensed to practice medicine in New York, he is board certified in both infectious disease and internal medicine, and he is Chief of Infectious Disease at two major teaching hospitals in New York City. He regularly teaches courses in infectious disease to other physicians and he has authored 45 published articles on the subject and 15-20 chapters in various medical texts. Dr. Farber has given expert testimony on 25 to 30 occasions, primarily on behalf of other physicians, and he has consulted with The Ohio Attorney General's office on one other case in this court.

{¶ 31} Dr. Farber testified that plaintiff did not have either MRSA or osteomyelitis when Dr. Block performed surgery in 2007. According to Dr. Farber, the MRI that Dr. Graboff relies on in concluding that plaintiff had MRSA in 2001, does not support that conclusion. Dr. Farber testified that if plaintiff had been infected with MRSA and/or

osteomyelitis in 2001, signs of infection would be grossly visible in 2007. According to Dr. Farber, while MRSA is a very dangerous infection, it is confined to the skin and soft tissue and is easily curable; that in only 3 percent of cases does MRSA penetrate the soft tissue and cause internal infections such as osteomyelitis, sepsis or pneumonia.

{¶ 32} Although Dr. Farber had no reason to doubt the results of the 2006 culture which showed MRSA, he was confident that the infection had resolved and that the infection which occurred post-operatively in plaintiff was not the same infection. He stated that there is no such thing as chronic MRSA; that the infection either resolves or it gets much worse within a relatively short period of time. He did state that recurrent MRSA is common, particularly where the patient has co-morbidities such as peripheral vascular disease, psoriasis or the patient is a long term smoker. Dr. Farber noted that plaintiff had all of these risk factors.

{¶ 33} According to Dr. Farber, the cardinal signs of post-operative infections are: purulent drainage at the incision site (pus) and cellulitis (redness, warmth and swelling.) His review of plaintiff's medical records while under Dr. Block's care revealed no evidence of infection prior to the time plaintiff experienced wound dehiscence. In fact, Dr. Farber could find no documentation of infection prior to September 7, 2008, the date when the hardware in plaintiff's ankle became exposed. Dr. Farber testified that exposed hardware means osteomyelitis is present.

{¶ 34} Dr. Farber disagreed with Dr. Graboff's contention that Dr. Block should have ordered either a culture or a bone scan after plaintiff's September 26, 2007 office visit. Dr. Farber explained that there were no signs of infection at that time and, consequently, nothing to culture. He was also of the opinion that a bone scan is an antiquated method for detecting infection and that he had not ordered a bone scan to detect osteomyelitis in the past five to seven years.

{¶ 35} On cross-examination, Dr. Farber acknowledged that plaintiff had complained of tenderness and swelling in the past but he stated that her subjective complaints had not been confirmed by observation. Until such complaints are confirmed, Dr. Farber does not consider them to be signs of infection, just symptoms reported by the patient. He did agree that if plaintiff had shown signs of infection in 2007, she should have been referred to an infectious disease specialist.

{¶ 36} Based upon the totality of the evidence presented, the outcome of this case essentially boils down to a battle of the expert witnesses. On this issue, the court

finds that the testimony of Drs. Farber and Deheer is more believable than that of Dr. Graboff.

{¶ 37} The court notes that Dr. Graboff's testimony regarding infection differed significantly from that of Dr. Farber. For example, Dr. Farber, who is an expert in the field of infectious disease, effectively debunked Dr. Graboff's theory that in 2006 plaintiff developed chronic osteomyelitis secondary to MRSA and that the infection was spread by the surgery performed by Dr. Block. Dr. Graboff's theory does not square with the accepted science of infection as related by Dr. Farber. Similarly, while Dr. Graboff insisted that plaintiff suffered from neurotropic arthropathy, Dr. Deheer stated that such a condition is found almost exclusively in diabetic patients. Additionally, Dr. Deheer testified convincingly that the same surgical treatment would have been appropriate in plaintiff's case whether the condition in her lower extremities was the result of avascular necrosis or neuropathic arthropathy.

{¶ 38} Moreover, on cross-examination, defense counsel reviewed with Dr. Graboff his rather extensive history as an expert witness in medical cases. For example, Dr. Graboff acknowledged that: he had consulted with as many as 500 attorney clients by 2009; that he has been deposed 400 to 500 times, 96 in the last four years; that he has given trial testimony in 100 to 150 cases; and that his testimony favors the patient roughly 80 percent of the time. Dr. Graboff advertises as a medical expert on five different expert witness services, and on two websites. On one such website Dr. Graboff will answer medical questions posed to him online for a fee. Even with this volume of work as an expert, Dr. Graboff claims to spend less than 40 percent of his professional time on forensic work.

{¶ 39} Upon review of the testimony of all the experts in this case, the medical records and lay testimony relied upon by such experts in reaching their respective opinions, and in assessing the credibility of the expert testimony, the court finds that Drs. Farber and Deheer were the most credible and persuasive. Based upon such testimony, the court finds that plaintiff did not have either MRSA or osteomyelitis when she presented to Dr. Block for treatment; that Dr. Block accurately diagnosed plaintiff's condition as avascular necrosis; that the surgical option presented to plaintiff and ultimately performed by Dr. Block was an acceptable mode of treatment for plaintiff's condition; that plaintiff did not show signs of an infection post-operatively until

September 7, 2008, when the surgically implanted hardware became exposed; and that osteomyelitis was timely diagnosed and treated.

{¶ 40} The court further finds that the risk of dehiscence and non-union associated with plaintiff's surgery was relatively high given her history of peripheral vascular disease, rheumatoid arthritis, cortosteroid treatment, obesity, history of infection, and the progression of the disease process. However, the totality of the evidence convinces the court that such risk was not unreasonable under the circumstances. Thus, Dr. Block's decision to present plaintiff with a surgical option and then proceed with surgery was within the standard of care. Furthermore, while the court is not required to determine whether and to what extent the post-operative dehiscence and non-union was caused by plaintiff's failure to follow Dr. Block's post-operative orders, the court finds that plaintiff's continued smoking and her failure to avoid using the leg, including a fall in the shower, most assuredly contributed to the ultimate failure of the surgery. Finally, the court finds that the infection which developed post-operatively was not the result of Dr. Block's failure to comply with the accepted standard of post-operative care. Rather, the court is convinced by the testimony of Dr. Farber that the infection developed in late September 2008 as a result of a combination of plaintiff's co-morbidities, her failure to comply with Dr. Block's orders, and her chronic vascular disease process.

{¶ 41} In short, plaintiff failed to prove that her injury was the direct and proximate result of a breach of the standard of care by Dr. Block. Accordingly, judgment shall be rendered in favor of defendants.



# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

MYRA SHEPHERD

     Plaintiff

     v.

OHIO STATE UNIVERSITY PODIATRY, et al.

     Defendants

Case No. 2009-09639

Judge Joseph T. Clark

<u>JUDGMENT ENTRY</u>

{¶ 42} This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendants. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
JOSEPH T. CLARK
Judge

cc:

Brian M. Kneafsey, Jr.
Jeffrey L. Maloon
Paula Luna Paoletti
Assistant Attorneys General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Chris C. Tsitouris
150 East Mound Street, Suite 206
Columbus, Ohio 43215-5429

Donald L. Anspaugh
Douglas J. Suter
250 East Broad Street, Suite 900
Columbus, Ohio 43215-3742

006
Filed July 25, 2012
To S.C. Reporter January 16, 2013